STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
THOMAS FARROW, JR., DEFENDANT-APPELLANT.

Argued June 7, 1971—Decided September 8, 1972.

436

*Mr. Richard Newman,* Designated Counsel, argued the cause for defendant-appellant (*Mr. Stanley C. Van Ness,* Public Defender, attorney).

*Mr. John P. Goceljak,* Assistant Prosecutor, argued the cause for plaintiff-respondent (*Mr. Joseph D. J. Gourley,* Passaic County Prosecutor, attorney).

The opinion of the Court was delivered by

HALL, J. The defendant was convicted in 1970 in the Passaic County Court of first degree murder based on a killing during an attempted robbery. *N. J. S. A.* 2A:113–2. The State sought the death penalty. The jury made no recommendation of life imprisonment, so a sentence of death was necessarily imposed. *N. J. S. A.* 2A:113–4. His appeal was taken to this court as of right. *R.* 2:2–1(a)(3).

Subsequent to the oral argument of the appeal, this court decided *State v. Funicello,* 60 *N. J.* 60 (1972), following the memorandum decision of the United States Supreme Court in *Funicello v. New Jersey,* 403 *U. S.* 948, 91 *S. Ct.* 2278, 29 *L. Ed. 2d* 859 (1971). We there concluded that the United States Supreme Court had held that the death penalty was unconstitutional under our statute, *N. J. S. A.* 2A:113–3 and 4. Accordingly, we set it aside as to that defendant and all others similarly sentenced who were parties to that cause, and sentenced them to life imprisonment, *nunc pro tunc* as of the date the death sentence was initially imposed, with entitlement to the same credits as if initially sentenced to life imprisonment. We also said that a like order would be made on motion before us or in the trial court by all other defendants now under a sentence of death. Pursuant thereto defendant Farrow made a motion before us for that relief, which was granted on February 1, 1972. As a result, what was briefed and argued—and indeed tried—as a capital case is no longer that. Defendant's points attacking the validity of the death penalty, the selection of the jury pursuant to the requirements of *Witherspoon v. Illinois,* 391 *U. S.* 510, 88 *S. Ct.* 1770, 20 *L. Ed. 2d* 776 (1968), and related matters have become moot.[1]

---

[1]Included is the argument that "[t]he exclusion of persons with conscientious scruples against the death penalty violated the rights of defendant under the Fourteenth Amendment in that it resulted in a biased and prosecution-prone jury, unable to accord the defendant a fair trial on the issue of guilt, and a jury unfairly predisposed against the selection of penalties other than death." We had re-

The State's proofs establishing the commission of the crime were not contested at the trial. The real question was whether defendant was one of the participants. The evidence to implicate him was of three principal kinds: pre-crime conduct, identification of him as one observed fleeing the scene, and certain post-crime conduct, together with some incriminating physical evidence. The case was peculiarly one for jury evaluation of the credibility of the State's principal witnesses. If they were believed, as the verdict indicates they must have been, the web of proof of guilt approached the overwhelming. No claim is made that the verdict is against the weight of the evidence. Defendant did not take the stand. His defense was an alibi and his proofs were not strong. Testimony was presented by third persons that during at least a part of the evening in question he, who lived in the general area, was in attendance at a fashion show held in a tavern three blocks from the scene of the crime.

The major contentions in defendant's brief and oral argument, aside from the death penalty points previously mentioned, claimed that identification evidence was admitted in violation of the exclusionary rule laid down in *United States v. Wade,* 388 *U. S.* 218, 87 *S. Ct.* 1926, 18 *L. Ed. 2d* 1149 (1967), and related cases, and of the requirement of *Stovall v. Denno,* 388 *U. S.* 293, 87 *S. Ct.* 1967, 18 *L. Ed. 2d* 1199 (1967), that police procedure with respect to an out-of-court identification must not be so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification. At the time of oral argument there was pending before the United States Supreme Court a case involving the limits of the *Wade* rule, and we deemed it advisable to defer decision of this appeal until that court had spoken. The decision in the case referred to has recently been handed down, *Kirby v. Illinois,* 406 *U. S.* 682, 92 *S. Ct.* 1877, 32

jected this argument before our death penalty was invalidated, *State v. Forcella,* 52 *N. J.* 263, 285–286 (1968), and refused to reconsider it afterward, *State v. Trantino,* 60 *N. J.* 176, 179 n.1 (1972).

L. *Ed. 2d* 411 (1972), followed by our own decision in *State v. Earle,* 60 *N. J.* 550 (1972), which will be mentioned more fully in our discussion of the identification issues. It is enough at this point to say that by reason of those decisions, several of defendant's arguments concerning the identification procedures have also fallen away.

## I

### *The Evidence*

We turn to a summary of the pertinent evidence. It should be noted at the outset that defendant was not charged with the crime until the indictment was returned on February 4, 1969; his arrest followed shortly after that date. Much of the evidence introduced by the State was not known to it until months after the offense.

Isadore Herman and his wife, both 82 years of age, ran a grocery store on Monroe Street in Passaic. They lived in an apartment above the store, which was entered from Grove Street near its intersection with Monroe. It was their custom to take the day's receipts to the apartment when they closed the store in the early evening. It was also Mrs. Herman's habit thereafter to put the garbage outside. On March 14, 1968, while she was engaged in that chore at about 8:45 P.M., two armed men barged into the apartment. One was black and one white. (Defendant is black; no one else has ever been charged with the crime.)

A scuffle ensued, during which the intruders fired a number of shots. Six struck Mr. Herman, killing him. These were found to have come from a S & W 38 caliber revolver. Mrs. Herman was wounded by three shots. She immediately went into a state of shock and was never able to meaningfully assist the police with helpful descriptions of the men or to clearly identify anyone. The bandits fled without the store receipts, which were in a bag on a table, as was a knife. In their flight they left outside the apartment door a badge case

containing an imitation gold police badge and at the foot of the stairs a brown hat containing a haberdasher's name.

The evidence of pre-crime conduct of the defendant commenced with the testimony of Paul Shaver, an FBI confidential informant, and James R. Laughlin, in charge of that agency's Paterson office. Their testimony also raised the first of the identification issues urged by defendant.

Shaver, in a *Wade* type hearing out of the presence of the jury (similar *voir dire* hearings were also held as to the other identification witnesses), testified that on the afternoon of February 24, 1968, he, along with James Mohan, went to a tavern in Passaic where they met an acquaintance, "Bobby" McCallum and another man called "Sonny," whom he did not previously know. The four were together in the tavern and a car for a half hour or so. He made an in-court identification of defendant as looking like "Sonny," although he had changed somewhat in appearance. (Defendant's nickname is "Sonny.") The day after the murder he sought out Laughlin, who later showed him a picture of defendant and told him it was that of "Sonny" Farrow. He told Laughlin the photo (a police shot taken about four years earlier) looked like the "Sonny" he had met on February 24. The trial judge ruled that, under all the circumstances, the photographic identification was not so impermissibly suggestive as to preclude its admissibility, that the in-court identification was not tainted, and that the weight of both was for jury determination.

Shaver's testimony as to the events of February 24 was much more extensive when he testified before the jury. (He repeated his in-court identification of defendant.) That testimony dealt with a stakeout of the Herman premises. They were only in the bar a few minutes. "Sonny" asked to be driven to the other side of town. Shaver drove, with Mohan in the front seat and "Sonny" and McCallum in the back seat. He was directed by "Sonny" to Grove Street, where they parked for 10 minutes or so near the entrance to the Herman apartment. "Sonny" talked about robbing the

Hermans, saying that they had a lot of money upstairs; that he had been watching the place; that it could not be burglarized; that "four guys have to rob them"; and that the Hermans would fight rather than give up their money. Shaver said he did not want to participate but might let "Sonny" use his car. While they were parked, Mrs. Herman came downstairs to put out garbage; "Sonny" identified her to the others. Shaver also testified that while the four were talking, "Sonny" was flipping a toy police badge in his hand, which he said was "just like" the one previously referred to as having been found at the scene after the killing. When they noticed they were being observed by a man in a garage window across the street, they left. Shaver also related to the jury his contact with Laughlin the day after the killing and his identification of the photograph Laughlin produced. He said he made the contact because he feared he might be suspected if the surveillance had been observed and reported.[2]

Agent Laughlin's testimony before the jury was confined largely to corroboration of Shaver's identification of the photograph of defendant. He said he discussed with the Passaic police department the facts he had obtained from Shaver[3] (but, in accordance with agency policy, without disclosing the name of his informant or of the others mentioned by Shaver), received the photograph and thereafter reported to the police that Shaver had identified it as that of "Sonny." His testimony on the *voir dire* of what Shaver had told him about the stakeout was ruled hearsay and inadmissible before the jury.

[2]Shaver had a criminal record and was in trouble with the law. This was thoroughly explored by defense counsel, as was the matter of receipt of compensation, favorable treatment or promises thereof after he had told the police, some months after the crime, what he knew. The same course was pursued with respect to other prosecution witnesses who had criminal records and charges pending against them.

[3]Laughlin, in his *voir dire* testimony, also said that Shaver had told him "Sonny" had participated in a recent holdup in the neighboring town of Wallington and that he had told this to the Passaic police, who confirmed it before giving him defendant's photograph.

The witness William ("Bobby") McCallum, a friend of defendant's of several years' standing, testified that he was with defendant, Shaver and Mohan[4] in the car at the stakeout and substantially corroborated Shaver's story of what took place at that time. He said that Mohan was also interested in robbing the Hermans, but that he told defendant he wanted no part of it. (McCallum also had a criminal record and in fact was in jail for the Wallington robbery (see footnote (3)) at the time of the crime; his knowledge also did not become available to the State until some months after the offense.)

The final witness who testified as to defendant's pre-crime conduct was Eugene Edwards, a friend of defendant's (who also had a criminal record and whose testimony was not known to the police until long after the killing). Edwards said defendant told him the day before the crime that "he ought to have a nice piece of money tomorrow night." He also testified that in March 1968 defendant had a S & W 38 caliber revolver and had shown it to the witness.

The evidence identifying defendant as one of two men leaving the Hermans' apartment came from two neighborhood youths, Lamonte Stallings, age 16, and Fernando Rojas, age 14. Both testified on *voir dire* and then repeated before the jury that part of their testimony found to be admissible. Their stories were substantially the same, but Stallings gave fuller descriptions of the men. (Throughout his identifications were more precise and positive than those of Rojas.) On the evening of March 14 they were walking on the street near the Herman store, when they heard the sound of breaking glass and shots. As they approached the stairway entrance to the Hermans' living quarters, two men came hurriedly down the steps. The first was a white man with a stocking over his head. The second was black, wearing a hat. Both of the boys saw his face, visible by the light from a nearby street light. Stallings described his features in some

---

[4]Mohan did not testify; his absence was explained by the prosecution.

detail. (There was considerable interrogation of all the identification witnesses about the extent of hair and other marks on defendant's face during the period in question; taken as a whole, the testimony thereon was not conclusive.) The men went up the street and shortly a car, which had been double-parked within the block, pulled away speedily. Defendant does not contend that this evidence was improperly admitted. Both also made in-court identifications of defendant on the *voir dire*. That of Stallings was held admissible and repeated before the jury; Rojas' was found inadmissible and was not heard by the jury.

Photographic and in-person identifications were later made by the boys, which form defendant's principal contentions of error. The day after the event, March 15, Stallings told his high school guidance counselor what he had seen and asked what he ought to do. As a result, Stallings went to police headquarters that afternoon and, in the company of Detective Jacalone, examined volumes of police "mug-shots." He picked out the photo of a man named Hill as resembling most, of the photos he saw, the black man he had observed leaving the scene of the crime.[5]

Stallings was at police headquarters again on the afternoon of March 19. Defendant was also there in custody,[6]

---

[5]Jacalone testified before the jury that, as a result of his later examination of the volumes of photographs, he was satisfied that defendant's picture was not in the books when Stallings went through them. This would seem to be correct since, it will be recalled, the Passaic police had given Agent Laughlin defendant's photograph on that day.

[6]Defendant had been picked up on March 18 under an arrest warrant relating to his participation, along with McCallum, in the Wallington robbery. Presumably by reason of the information received from Agent Laughlin, he was questioned as to his whereabouts on March 14. The story he told differed from that given in the bill of particulars as to his alibi previously furnished the State (*see R.* 3:11–1) and that later testified to by his alibi witnesses. Testimony of defendant's story to the police was excluded by the trial judge on the basis that he was not satisfied beyond a reasonable doubt that a

but no charge was made against him in connection with the Herman murder. Stallings was seated in the detective squad room when he noticed a man coming out of a nearby detention room. Immediately and spontaneously he told Jacalone that this was the man he had seen leaving the Herman premises. This chance encounter was held by the trial court to be admissible and the testimony was repeated to the jury. Defendant makes no claim of error in this regard.

Detective Jacalone then showed Stallings five photographs of black males. Four were taken from police albums (that of Hill was not included) ; the fifth was one of defendant taken that day. It was slightly larger than the rest, not yet having been cut down to fit into an album. None of them bore any identifying information. Stallings picked out that of defendant as the man he had seen leaving the scene of the crime and signed it on the back. A statement was then taken from him, during which time defendant was brought into the room and identified by Stallings face-to-face. The trial court, on the *voir dire,* held all this identification to be admissible as being not so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification, and most of the evidence was repeated to the jury.[7] Jacalone also gave corroborating testimony to the jury.

Rojas was brought to police headquarters the next day, March 20. He was shown the same five photographs and selected that of defendant as the man he saw the night of the crime. The testimony was inconclusive as to whether he had turned them over and saw Stallings' signature on the back.

copy of it had been supplied the defense pursuant to a pretrial discovery order. A search of defendant incidental to his arrest disclosed narcotics paraphernalia. A few days later he pleaded guilty in Municipal Court to a charge based thereon and was sentenced to six months in the county jail. None of this was brought out before the jury.

[7]The testimony as to the face-to-face identification during the taking of the statement was not repeated to the jury. The five photographs were introduced in evidence.

Rojas then viewed four black males, including defendant, in a detention room through a one-way mirror and picked out defendant. The trial judge held the photographic identification to be not impermissibly suggestive and so admissible, but excluded the mirror viewing and the in-court identification. He found the mirror viewing to amount to a lineup and that, under the rationale of *Wade* as he construed it, defendant was entitled to counsel thereat. He refused to allow evidence of the in-court identification because he felt he could not charge the jury concerning it without disclosing the fact of the inadmissible viewing. (An independent basis for in-court identifications was not attempted with respect to any of the identification witnesses.) Rojas then repeated the photographic identification to the jury and Jacalone corroborated it.

The evidence as to defendant's post-crime conduct was produced through Edwards and McCallum, both referred to earlier, and one Frank Forte, who was a cellmate of defendant in the Passaic County jail in the fall of 1969, after the latter was indicted for the murder.

Edwards testified, on this aspect of the proofs, that on the evening of the crime he and defendant went at 7:30 P.M. to the tavern where the fashion show was to take place. Edwards was a model in the show. He said he did not see defendant after their arrival until the show was over at 10:30. (It was brought out that Edwards had given an earlier statement which recounted that he was with defendant all evening; he testified this was untrue.) Thereafter they visited various taverns until 3:00 A.M. when he drove defendant home. On the way defendant told him, without any details, that "he killed a guy." The next morning he went to defendant's home. While there defendant threw him the morning paper, which had a headline about the murder, and said "I told you I killed a guy." A few days later he spoke with defendant at Passaic police headquarters. Defendant asked Edwards to tell his mother to destroy all his clothes "from Cye Martin's." (This was the haberdasher whose name

was imprinted inside the hat found at the scene of the killing.) Edwards said he thereafter went to defendant's home and so told Mrs. Farrow.

McCallum, on this phase of the case, testified that when he first met defendant after the crime, which was some five or six months later, he asked him what had happened at the Hermans'. He said defendant told him that upon entering the apartment, Mrs. Herman started screaming, that Mr. Herman, who was cleaning chickens, came after him with a butcher knife (it will be recalled that the police found a knife on a table), that he had to shoot him, and that he tried to get "the [unidentified] white guy who was with him to kill the woman, but the guy wouldn't kill her."

Forte's testimony concerned conversations with defendant in jail and a letter defendant wrote him after his release. He said defendant asked him to go to see McCallum in East Rutherford upon his release and find out what his testimony would be and that "if he wasn't home to see his wife and tell her that, you know, accidents do happen and she got a couple of children." The letter, which had been intercepted by a prosecution informant and a copy made available to the State, said: "Remember that guy in East Rutherford? If they should get me on this, and they might, I am dead, all on that guy's word from East Rutherford."

II

*The Identification Issues*

*A.*

Defendant urges the broad constitutional proposition that a photographic identification when the subject is in custody cannot be conducted in the absence of counsel.[8] Since the

---

[8]The contention is actually made in defendant's brief only with respect to the photographic identification by Rojas. We pass the question that the argument does not appear to have been asserted at the trial.

argument derives from the "line-up cases"—*United States v. Wade, supra* (388 *U. S.* 218, 87 S. Ct. 1926, 18 *L. Ed. 2d* 1149), and *Gilbert v. California,* 388 *U. S.* 263, 87 *S. Ct.* 1951, 18 *L. Ed. 2d* 1178 (1967)—our consideration should begin with them. They held that an accused is entitled to counsel at any "critical stage of the prosecution," that a post-indictment lineup is such a "critical stage," and that failure to afford counsel requires the exclusion of evidence of such a lineup identification. The same day the court decided *Stovall v. Denno, supra* (388 *U. S.* 293, 87 S. Ct. 1967, 18 *L. Ed. 2d* 1199), which involved a one-on-one, emergency, pre-indictment identification. It held that *Wade* was not applicable, because it would not be applied retroactively, and that the question was whether the confrontation "was so unnecessarily suggestive and conducive to irreparable mistaken identification that [defendant] was denied due process of law." 388 *U. S.* at 302, 87 S. Ct. at 1972, 18 *L. Ed. 2d* at 1206.

The next year a photographic identification case came before the court. *Simmons v. United States,* 390 *U. S.* 377, 88 *S. Ct.* 967, 19 *L. Ed. 2d* 1247 (1968). It concerned a pre-arrest identification of photographs of the defendant by eyewitnesses to the crime. The contention was not made that he was entitled to counsel at the time the pictures were shown to the witnesses, so this question was not decided. The assertion rather was "that in the circumstances the identification procedure was so unduly prejudicial as fatally to taint his conviction", which, the court said, "must be evaluated in light of the totality of surrounding circumstances", citing *Stovall.* 390 *U. S.* at 383, 88 S. Ct. at 970, 19 *L. Ed. 2d* at 1252–1253. Mr. Justice Harlan went on to speak further of identification by photograph:

We are unwilling to prohibit its employment, either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement. Instead, we hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set

aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. This standard accords with our resolution of a similar issue in Stovall v. Denno, 388 U. S. 293, 301–302, 87 S. Ct. 1967, 1972–1973, 18 L. Ed. 2d 1199, 1206, and with decisions of other courts on the question of identification by photograph. (390 *U. S.* at 384, 88 *S. Ct.* at 971, 19 *L. Ed.* 2d at 1253).

The United States Supreme Court has not since directly passed upon the right to counsel at photographic identifications. As defendant concedes in his brief, most federal circuit courts of appeal and state appellate tribunals have refused to apply the *Wade* exclusionary rule in such situations. He does rely on the contrary view of the Court of Appeals for the Third Circuit in *United States v. Zeiler,* 427 *F.* 2d 1305 (1970), in which a panel of that court held that the *Wade* rule does apply to pretrial photographic identification of an accused who is in custody. There the defendant had not only been arrested for the crime as to which the identification was made, but counsel had been appointed for him. But very recently the same court, sitting *en banc,* overruled this holding of *Zeiler.* United States ex rel. *Reed v. Anderson,* 461 *F.* 2d 739 (3 Cir. 1972). It may be noted that even the dissenting judges in *Reed,* one of whom had written the opinion in *Zeiler,* agreed that "[t]he *Zeiler* rule is inapplicable to such photographic exhibition during investigation preliminary to possible charging." (461 F. 2d p. 752).

Shortly before *Reed* was handed down, the Court of Appeals for the District of Columbia held in accordance with *Zeiler,* expressly relying upon it. *United States v. Ash,* 461 *F.* 2d 92 (D. C. Cir. 1972). Significantly, the United States Supreme Court has granted certiorari in that case on the government's petition. 407 *U. S.* 909, 92 *S. Ct.* 2436, 32 *L. Ed.* 2d 682 (1972). In *Ash,* as in *Zeiler,* the defendant was in custody, presumably for the crime involved, and counsel had been appointed. While following *Zeiler,* the majority did say:

There are instances in which a photographic exhibition—even though an event capable of being adduced at trial—is too preliminary and preparatory to be regarded as a critical stage of the prosecution requiring attendance of defense counsel. Certainly when a case is in the pre-arrest investigative stage there is justification for photographic viewings, assuming no undue suggestiveness, *Simmons v. United States*, 390 *U. S.* 377, 88 S. Ct. 967, 19 L. Ed. 2d 1247 . . . . (461 F. 2d at 101–102).

▮ Our obligation, in resolving the question before us, is to divine, as best we can, what result the United States Supreme Court would reach in our case. *See Roadway Express, Inc. v. Director, Division of Taxation,* 50 *N. J.* 471, 475 (1967), appeal dismissed 390 *U. S.* 745, 88 *S. Ct.* 1443, 20 *L. Ed. 2d* 276 (1968). Some clue is found in *Kirby,* which we followed in *Earle.* There at a police station the victim of robbery identified as the culprits, in a face-to-face confrontation (not a lineup), two men whom the police had arrested. They had not been formally charged with the offense. The majority held evidence of the identification admissible on the basis that a person's right to counsel "attaches only at or after the time that adversary judicial proceedings have been initiated against him." The latter was defined as "formal charge, preliminary hearing, indictment, information, or arraignment." 406 *U. S.* at 689, 92 S. Ct. at 1882, 32 *L. Ed. 2d* at 417.[9] There seems every reason to think that, at the very least, the same holding would be applied to investigative, precharge photographic identifications. As we have noted, even *Zeiler* and *Ash* excepted photographic viewings at such early stages from the scope of their holdings. Indeed, the court could soundly hold more broadly that the stage at which photographic identification takes place is of no relevance on the question of admissibility, but that the test should be only that of impermissible suggestiveness as indicated in our quo-

---

[9]It would seem to follow that the identification of defendant by Rojas through the mirror (which was excluded by the trial court on the ground that *Wade* applied) should have been admitted, as well as his in-court identification.

tation from *Simmons*. Photographic identifications have many facets and serve many purposes. For example, they may be quite properly used to buttress other evidence in the preparatory stages of a prosecution when the defendant has been indicted or an arrest warrant issued, but has not been apprehended, so that no counsel has been appointed for him and no lineup is possible. In fact, the idea of requiring counsel for photographic identifications generally approaches the impractical, if not the ridiculous. Again, for example, eyewitnesses are frequently shown photographs of several persons whom the police conceive, on the basis of past conduct, as capable of the offense in question, but against none of whom is there yet any real evidence, nor have any of them been taken into custody. Is counsel to be appointed for each person whose photograph is shown? Other similar situations, common in law enforcement practice, can readily be brought to mind.

We therefore hold that there was no error in the admission of the photographic identifications of defendant on the ground that they were conducted in the absence of counsel.[10]

### B.

Defendant argues alternatively that the photographic identifications by Stallings, Rojas and Shaver should not have been admitted in evidence (and so the in-court identifications by Stallings and Shaver should also have been excluded), because, under the rule laid down in *Stovall* and *Simmons*, they were so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification and thus resulted in a denial of due process. We have consistently applied that test of admissibility since *Stovall* in photo-

---

[10]Any indication to the contrary in *State v. Edge*, 111 *N. J. Super.* 182 (App. Div. 1970), reversed on other grounds, 57 *N. J.* 580 (1971), is disapproved.

graphic, as well as personal confrontation, identifications. *See, e. g., State v. Matlack,* 49 *N. J.* 491 (1967), *cert.* den. 389 *U. S.* 1009, 88 *S. Ct.* 572, 19 *L. Ed. 2d* 606 (1967); *State v. Mustacchio,* 57 *N. J.* 265 (1970); *State v. Royster,* 57 *N. J.* 472 (1971), *cert.* den. 404 *U. S.* 910, 92 S. Ct. 235, 30 *L. Ed. 2d* 182 (1971); *State v. Thompson,* 59 *N. J.* 396 (1971).

▇ Impermissive suggestibility is to be determined by the totality of the circumstances of the identification. It is to be stressed that the determination can only be reached so as to require the exclusion of the evidence where all the circumstances lead forcefully to the conclusion that the identification was not actually that of the eyewitness, but was imposed upon him so that a substantial likelihood of irreparable misidentification can be said to exist. What is being tested in the preliminary inquiry as to admissibility is whether the choice made by the witness represents his own independent recollection or whether it in fact resulted from the suggestive words or conduct of a law enforcement officer. The strength or credibility of the identification is not the issue on admissibility; that is a matter of weight, for the fact finder, under appropriate instructions from the trial judge. As Judge Adams said with respect to photographic displays, in his concurring opinion in *Reed v. Anderson, supra,* ". . . I do not dispute that such an arrangement has a potential for error. However, because so many crimes can be proved only through the use of eye witness testimony, the admission of such evidence should not be unduly restricted. Rather such judicial policy should encourage full utilization of eye witness testimony, tested, of course, in the crucible of trial proceedings." (461 F. 2d p. 746).

Our examination of the photographs used here and the testimony as to the identifications therefrom convinces us that we cannot disagree with the trial court's conclusion, entitled to very considerable weight, that the procedure was not so suggestive as to require exclusion of Stallings' and Rojas' identifications of defendant. What defendant is really

complaining about is that the hour of the day and lighting conditions, the excitement of the occasion, and the fleeting glimpse that these young boys had of the culprits made their later identifications of defendant unreliable and untrustworthy. They were rigorously cross-examined, both on the *voir dire* and before the jury, by assiduous defense counsel and all weaknesses in their identifications fully pointed up. The worth thereof was for the fact finder, not for the court.

It will be recalled that Stallings' photographic identification was preceded by his chance encounter with defendant, at which time he spontaneously advised Detective Jacalone that this was the man he had seen leaving the Hermans' the night of the killing, so in his case the photographic display was of secondary importance. The mere fact that defendant's photograph was about an inch larger in length and breadth than the other four does not require exclusion. The picture was otherwise of exactly the same kind—front and side view, with identical finish and color—as the others. The other pictures were of men with both differing and similar facial characteristics, so as to afford a fair basis for choice. And there was no evidence, as to either Stallings or Rojas, that Jacalone had done or said anything to direct distinctive attention to defendant's picture. It is inferred that Rojas, who was not as strong a witness as Stallings, may have turned it over and seen Stallings' signature on the back. The testimony thereon was inconclusive in that the witness was in some doubt, but Jacalone testified that he was with Rojas all the time he was examining the photographs and that they were not turned over. The trial judge was justified in believing the officer.

Defendant also urges that, since defendant was in custody on another charge, a lineup should have been held, without any previous photographic identification. We know of no such requirement, either constitutional or non-constitutional. Under *Kirby* and *Earle*, defendant would not have been en-

titled to counsel in the event of a lineup and it is much more difficult to reconstruct such a procedure for a trial court and jury (unless a photograph thereof was taken) than in the case of photographic identification.

■ ■ A claim of error is also made with respect to the photographic identification by Shaver because Agent Laughlin showed him only one picture and told him it was of defendant. In the first place, the showing of a single photograph ordinarily goes only to weight, and not admissibility, of an identification. *State v. Matlack, supra* (49 *N. J.* at 498). But more important, the situation was entirely different than in the case of Stallings and Rojas. Here there was a known person and the purpose was only to add his full name to a nickname and to confirm the identity of the man having that name with the one in whose company Shaver had been. Moreover, the identification pales into insignificance in the light of the identical testimony of McCallum, who had known defendant for a long time and had been in the group on the day in question. There was no realistic possibility of misidentification.

In sum, defendant's contentions with respect to the out-of-court and in-court identification testimony of Stallings, Rojas and Shaver go merely to weight and not to admissibility under the circumstances here and provide no ground for reversal.

## C.

■ Defendant also urges error in the trial court allowing Agent Laughlin to corroborate the identification testimony of Shaver. We see no merit to the contention. Such testimony of a third party as to a statement of prior identification by a person, when that person is a witness at the trial, is clearly admissible in this state. *State v. Matlack, supra* (49 *N. J.* at 499–500) ; *Evidence Rule* 63 (1) (c).

## III

### The Police Report

Defendant further asserts reversible error in the denial by the court at trial, in connection with cross-examination of Detective Jacalone while testifying before the jury, of inspection of the whole of a lengthy police report of the early investigation of the crime. No constitutional question is involved. The contention must be considered in the light of the nature of the document, the circumstances under which the court's ruling was made and our pertinent rules.

Detective Jacalone was only one of many Passaic police officers who were assigned to and participated in the investigation of this murder. He was, however, directed by the superior official in charge of the investigation to prepare and maintain a complete detailed record for departmental files of what was done by every officer. The product was a 24-page typewritten narrative summary of the investigation, day by day and almost hour by hour, running from the first telephone call to the police department, minutes after the killing on March 14th, through April 10th. (The entire document was preserved by the trial judge for appellate purposes and we have carefully examined it.) It was prepared piecemeal some days after each event from the statements and individual reports of each participating officer other than himself. It included accounts of searches for clues and possible witnesses, running down leads, following through on possible suspects, interviews with many people and all else that goes into a thorough investigation of a serious crime by a city police department. Much of it represents highly confidential matters, particularly in the light of the fact that the white participant in the crime has never been apprehended. The only material in it which could be called a "statement" or "record of a statement" by Jacalone were the narratives of what he himself did in the investigation. As to the remainder, he was but a scrivener.

At the time the question came up at trial, Jacalone had already testified three times. Two of these were during the *voir dire* hearings on the admissibility of the Stallings' and Rojas' identifications. Defendant's counsel did not ask for the entire report on either of those occasions but had access to the portions Jacalone referred to in testifying as to his participation in the identifications. After and to the extent that the identifications were held admissible, Stallings and Rojas repeated their *voir dire* identification testimony before the jury. Then Jacalone was recalled to the stand in the presence of the jury. He testified on direct examination as to the identifications and also as to the circumstances in which he had obtained statements many months after the offense from Shaver, McCallum, Edwards and Forte, who had all testified previously. (There is no contention that anything in the police report was relevant to Jacalone's testimony concerning these witnesses.) During his testimony about Stallings' and Rojas' identifications before the jury, Jacalone also consulted portions of the police report dealing with his participation therein.

It was at the conclusion of this direct examination that defense counsel demanded the entire report for his inspection. After full argument, the trial court refused to allow defense examination of the whole report and ordered that defense counsel receive only those pages bearing on the direct testimony of the defendant. The prosecutor was directed to cull out such pages, after which the court reviewed the entire document and found that defendant was not entitled to more than the four pages selected. (After this appeal was taken, defense counsel received a complete copy for use in presenting argument to this court.)

At the outset it should be noted that we are dealing with production of a witness' statement at trial and not with pretrial discovery. The purpose of the latter is to aid in the preparation of the defense; that of the former is only for use on cross-examination to assist in testing credibility and accuracy of testimony given on direct examination. (A

good bit of defendant's argument is really directed to inspection for discovery purposes and is therefore inappropriate.) Defense counsel correctly conceded before the trial judge that the whole of a police report of this nature could not have been obtained on pretrial discovery. Our rules limit such discovery as to prospective witnesses for the State, on order of the court, to the names and addresses of persons known to have relevant evidence or information, indication of which of those persons may be used as witnesses, and copies of "relevant records of statements" by such persons within the possession, custody or control of the prosecuting attorney. *R.* 3:13–3(c). Specifically not subject to defense discovery are "reports, memoranda or internal documents" made in connection with the investigation or prosecution of the matter. *R.* 3:13–3(e). The report in question falls in the excluded category except the portions reciting the activities of Detective Jacalone, the preparer thereof. Discovery could be had, however, of the relevant original individual reports of other participating officer prospective witnesses mentioned in the master narrative. *See State v. Harrison,* 118 *N. J. Super.* 299 (Law Div. 1972).[11]

Production of a witness' statement at trial is governed by *R.* 3:17 (adopted as *R. R.* 3:7–3A(a) effective October 5, 1967). The rule derived from and broadly formalized the holding in *State v. Hunt,* 25 *N. J.* 514 (1958), upon which the trial judge relied here. There this court decided, in exercise of its inherent power to order discovery when justice so requires, that notes made and referred to by a prosecution police witness on direct examination "bearing on the subject of his direct examination be made available to the defendant for use in cross-examination." (25 *N. J.* at 524). *R.* 3:17–1 reads in pertinent part:

---

[11]Defendant had obtained a broad pretrial discovery order covering all such material. No point is made that he did not receive all he was entitled to thereunder.

If there shall not have been disclosure thereof before trial, the court on defendant's motion made at trial shall order the prosecuting attorney to produce any statement or record of a statement, as described in *R.* 3:13–3(c)(2), in his possession made by a witness who is about to testify on direct examination on behalf of the State, provided such statement is relevant to the offense charged. . . .

The rule must be interpreted in the light of its objective, *i. e.,* to aid effective cross-examination. Moreover, although the work product privilege as to pretrial discovery, set forth in *R.* 3:13–3(e) previously referred to, was not carried over into the rules dealing with disclosure at trial, this court has said that ". . . we may assume that its underlying policy considerations will be honored at trial to the extent that they are there applicable." *State v. Montague,* 55 *N. J.* 387, 402 (1970). And the rule is expressly limited to production of statements or records of statements of the particular witness. Thus the trial judge was clearly right in ruling that defense counsel was only entitled to those portions of the report narrating the activities of Jacalone. We also are of the opinion that, since the defense demand came after his direct examination and cross-examination would be limited to matters within the scope thereof, the judge was also correct in confining the production to those portions "bearing on the subject of his direct examination."

Defendant also urges that he was entitled to examine the entire report in order to make his own selection of the contents for use on cross-examination. This procedure is directly contrary to that prescribed by *R.* 3:17–2, which provides, in effect, that when the prosecuting attorney claims a document contains matter not within *R.* 3:17–1, the judge shall inspect the entire document and determine the portions to which defendant is entitled, but shall preserve the whole document for appellate purposes. *Cf. Irval Realty, Inc. v. Board of Public Utility Commissioners,* 61 *N. J.* 366, 375 (1972). This was the procedure followed here.

Finally defendant contends that there were other portions of the report bearing on the detective's direct testimony rela-

tive to the identifications by Stallings and Rojas which the trial court did not direct the State to furnish him. Matters of this minute nature must be largely left to the sound discretion of the judge on the scene. Unless his judgment was so far off the mark that it must be said the result in the case could reasonably have been affected, his action should be sustained. In this, as in all other aspects of the trial of this case, Judge Joelson was extremely conscientious, careful and patient and we think his exercise of judgment in this respect is not open to successful challenge. While there might be a few additional odd lines here and there in the 24 pages of the report which could be said to bear on Jacalone's identification testimony, we feel confident defendant was not prejudiced by his inability to examine them for cross-examination purposes. We cannot possibly conceive that, in the light of all the State's evidence, the final result would have been different if they had been furnished to the defense. Indeed, use of some of them might well have opened the door to damaging evidence against defendant otherwise not admissible.

The other points raised by defendant, relating to a claim of improper cross-examination of a defense witness later corrected by a specific jury instruction and of denial of a motion for jury sequestration, are so lacking in merit as not to require discussion.

The judgment of conviction, as modified by reduction of the sentence to life imprisonment, is affirmed.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, PROCTOR, HALL, SCHETTINO and MOUNTAIN—6.

*For reversal*—None.