# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2722-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

M.S.B.,[1]

     Defendant-Appellant.

_____

     Submitted December 4, 2024 – Decided February 20, 2025

     Before Judges Currier and Marczyk.

     On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 20-02-0355.

     Jennifer Nicole Sellitti, Public Defender, attorney for appellant (Stefan Van Jura, Assistant Deputy Public Defender, of counsel and on the brief).

     Mark Musella, Bergen County Prosecutor, attorney for respondent (Ian C. Kennedy, Assistant Prosecutor, of counsel and on the brief).

---

[1] We use initials and pseudonyms pursuant to Rule 1:38-3(c)(9) to identify defendant and others to protect the identity of the child victim in this matter.

PER CURIAM

Defendant M.S.B. appeals from his March 8, 2023 conviction and subsequent sentence following a jury trial. He principally challenges the trial court's failure to hold a <u>Wade</u>[2] hearing and the court's failure to give a proper jury charge concerning identification. He further contests the sentence imposed by the court. Based on our careful review of the record and applicable legal principles, we affirm.

I.

This appeal concerns then-twenty-five-year-old defendant's sexual assault of then-eleven-year-old Serena at her residence in 2019. We derive the following facts from the trial record, including portions of the November 2019 video recording of Serena's interview with a detective from the Bergen County Prosecutor's Office (BCPO).

Serena testified that when she was eleven, she went with her mother to a local park. She saw a "guy" at the park—whom she later identified as defendant—who walked past her, but they did not speak. Defendant

---

[2] <u>United States v. Wade</u>, 388 U.S. 218 (1967).

subsequently contacted Serena via Snapchat and sent her a message. Sometime thereafter, Serena obtained defendant's cell phone number.

Serena testified she spoke with defendant nearly every day for a few weeks. They primarily conversed through Snapchat and its video chat function but also spoke via FaceTime. She noted she told defendant where she lived, where she went to elementary school, and that she was eleven years old. She recalled defendant saying he was sixteen years old, and that his name was "X." She also recounted defendant sent her a photo of himself.

Serena testified that during one conversation in late August 2019, she advised defendant that her mother was leaving the apartment. Defendant then asked Serena if she would be alone in the apartment, and she responded in the affirmative. Defendant said he was nearby and asked if he could come to the apartment, to which Serena agreed.

Serena stated that when defendant arrived, the two sat on the living room couch. Shortly thereafter, defendant began kissing her and touching her over her clothes. Serena indicated she tried to move away from defendant, but he "moved [her] back." Serena recalled telling defendant "no" at least twice but felt "speechless," as if "[she] couldn't talk." However, defendant proceeded to remove both of their clothes and then engaged in various sexual acts (fellatio,

cunnilingus, and penile-vaginal penetration) until he ejaculated. After the incident, defendant contacted Serena several other times requesting to meet again, but she declined because she "[did not] want to see him."

Subsequently, Serena's mother found out about the incident and questioned her, but Serena indicated she "had a tough time responding." Serena eventually confided in her brother Leo, who was around twenty-one years old at the time, and told him about her conversations with defendant and what occurred when defendant came to the apartment. Leo informed his parents about Serena's disclosures, and they requested access to Serena's cell phone and Snapchat account, which she provided.

At trial, Leo testified he obtained defendant's social media account information and phone number from Serena and then texted defendant. Leo explained he used a fake social media profile, depicted himself as a seventeen-year-old female during the conversation with defendant, and sent defendant a picture and video of a seemingly young girl he knew "to make it look more real." Defendant responded with a picture of himself, which Leo described as portraying "a grown man."

Leo sent the photograph of defendant to Serena's mother, who showed it to Serena and asked if she knew the man in the picture. Serena said she

recognized the person as "the guy that [came] to the apartment." The family then notified local authorities who, in turn, contacted the BCPO, which began an investigation in November 2019.

During Serena's interview with detectives, she discussed her conversations with defendant, the subsequent sexual assault at the apartment, and Leo's investigation of defendant on social media. She recounted defendant had "[d]ark skin" and a tattoo of the word "King" on one of his arms and that he had two cell phones.

As part of the investigation, Detective Wendy Cevallos, who had no knowledge of the case, conducted a photographic array. Cevallos showed Serena six photographs, one-by-one in sequential order, of individuals matching the description of the suspect . Cevallos testified that Serena identified the man in the fourth photograph in the lineup as the man who assaulted her. It was a picture of defendant. Serena asserted she was "100 percent certain" in her identification. Serena also identified defendant as the same person in the photo her mother previously showed her.

Detective Karolina Gregorek-Longares subsequently used Serena's Snapchat account to identify defendant's Snapchat account, which contained his phone number. Detective Gregorek-Longares, posing as Serena, then contacted

5

defendant using Serena's Snapchat account. During the conversation, defendant acknowledged his prior sexual encounter with Serena, which corroborated her version of events. He further stated he would come to Serena's apartment the following day to engage in sexual intercourse.

Subsequently, defendant was arrested. Officers took a photograph of defendant's tattoo located on his left arm, which said "Loyalty King." They also located two cell phones belonging to defendant. Forensic Analyst Kristen Paxos testified regarding the data extracted from Serena's devices, Leo's cell phone, and defendant's two iPhones. Paxos testified that she extracted Leo's conversation with defendant, during which Leo pretended to be a seventeen-year-old girl and defendant sent a picture of himself.

Serena's devices also contained records of communications with defendant through FaceTime, text message, and Snapchat and included defendant's Snapchat account information, which was registered to his cell phone. Paxos further testified defendant's cell phone revealed he communicated with Serena via Snapchat between August 2019 and November 2019 and saved Serena's Snapchat username as a contact. Defendant's other cell phone had a photograph of Serena in a sports bra, her phone number, and the text messages with Leo.

In February 2020, defendant was indicted and charged with two counts of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1) (counts one and two); two counts of second-degree sexual assault, N.J.S.A. 2C:14-2(b) (counts three and four); third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1) (count five); and second-degree attempted aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1) (count six).

Defendant moved to suppress Serena's identification evidence, or, alternatively, for a pretrial evidentiary hearing pursuant to Wade, 388 U.S. 218, and State v. Henderson, 208 N.J. 208 (2011), to determine the reliability of Serena's statements identifying defendant. The court, as discussed more fully below, denied defendant's motion, finding there was insufficient proof of suggestiveness to warrant a Wade hearing.

The jury trial began in October 2022, and lasted several weeks. The court held a charge conference toward the end of trial. The court and parties tailored the model jury charges to in-court and out-of-court identifications. Defense counsel indicated "the charges [were] sufficient" but requested the jury be instructed on the use of "a database of digital photos when [an] electronic mugshot was utilized," to which the State agreed. Regarding the instructions on the identification factors, the State contended, and defense counsel did not

object, that the identification factors concerning "multiple viewing[s]" and "showup[s]" should be excluded because neither occurred in this case. Defense counsel argued to include the "feedback" charge. However, the State contended that factor did not apply because Leo was not present when Serena attended the BCPO photo array, and defense counsel thereafter agreed.

The court charged the jury on the use of digital photographs and a private actor's potential influence on an identification. On October 27, 2022, the jury found defendant guilty of first-degree aggravated sexual assault (count one), second-degree sexual assault (count four), and third-degree endangering the welfare of a child (count five), and not guilty as to the remaining charges.

The court sentenced defendant on March 3, 2023. In determining the appropriate sentence, the court applied aggravating factor three, risk of re-offense, N.J.S.A. 2C:44-1(a)(3), based on defendant's psychological report indicating he had a "well-above average risk to re-offend." It also applied aggravating factor six, prior criminal history and seriousness of the convicted offense, N.J.S.A. 2C:44-1(a)(6), because defendant had two prior convictions for similar sexual acts. The court also found aggravating factor nine, need to deter, N.J.S.A. 2C:44-1(a)(9). Lastly, the court applied mitigating factor fourteen, N.J.S.A. 2C:44-1(b)(14), because defendant was under twenty-six

years old at the time of conviction but gave it "very low weight" due to defendant taking advantage of Serena at her young age.

After considering the factors, the court sentenced defendant to thirty-five years in prison with a thirty-five-year parole ineligibility period for the conviction of aggravated sexual assault. It also imposed a twenty-year prison sentence with a twenty-year parole disqualifier for defendant's conviction of sexual assault, and a five-year flat prison sentence for endangering the welfare of a child, which were ordered to run concurrently with the aggravated sexual assault sentence. The court further imposed several fines and fees, along with a Nicole's Law[3] restraining order, Megan's Law[4] reporting requirements, and parole supervision for life.

## II.

Defendant raises the following points on appeal:

POINT I

THE MATTER MUST BE REMANDED FOR AN EVIDENTIARY HEARING PURSUANT TO CHEN[5] BECAUSE THE PRIVATE ACTOR'S SHOWUP PROCEDURE WAS MADE UNDER HIGHLY

---

[3] N.J.S.A. 2C:14-12 and N.J.S.A. 2C:44-8.

[4] N.J.S.A. 2C:7-1 to -23.

[5] State v. Chen, 208 N.J. 307 (2011).

SUGGESTIVE CIRCUMSTANCES THAT COULD LEAD TO A MISTAKEN IDENTIFICATION.

POINT II

THE CONVICTIONS MUST BE REVERSED BECAUSE THE COURT'S MODIFIED JURY CHARGE ON IDENTIFICATION OMITTED GUIDANCE ESSENTIAL TO A FAIR EVALUATION OF [SERENA]'S IDENTIFICATIONS.

POINT III

THE [THIRTY-FIVE]-YEAR SENTENCE WITH [THIRTY-FIVE] YEARS OF PAROLE INELIGIBILITY IMPOSED ON THIS YOUTHFUL OFFENDER WAS MANIFESTLY EXCESSIVE AND UNDULY PUNITIVE.

A.

We first address defendant's argument that the trial court erred in denying him a Wade hearing. He contends that Serena's mother showing a single photograph of defendant to Serena "was made under highly suggestive circumstances" that could lead to a mistaken identification and potentially "tainted" the subsequent photo array by the BCPO.[6]

The trial court has discretion in determining whether a full Wade hearing regarding the suggestiveness of an identification is necessary. State v. Ortiz,

---

[6] Defendant did not challenge the photo array conducted by the BCPO.

203 N.J. Super. 518, 522 (App. Div. 1985). Therefore, we review the grant or denial of the hearing for an abuse of discretion. Ibid. Similarly, "we are mindful that the trial court's findings . . . on the admissibility of identification evidence are 'entitled to very considerable weight.'" State v. Adams, 194 N.J. 186, 203 (2008) (quoting State v. Farrow, 61 N.J. 434, 451 (1972)). Accordingly, this court will "uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." State v. Lamb, 218 N.J. 300, 313 (2014).

Defendant asserts Serena made her identification under highly suggestive circumstances that could lead to a mistaken identification because Serena's mother showed Serena defendant's photograph a few days prior to the BCPO photo array. Defendant notes the prevailing case law obligated the court to hold a hearing during which the State must prove the eyewitness identification is reliable under the applicable system and estimator variables outlined in Henderson, 208 N.J. at 218-19, holding modified by Chen, 208 N.J. at 327. He further argues the process was highly suggestive because Leo conducted online research regarding defendant's prior criminal conduct and shared that information with Serena.

The State counters the court correctly admitted the identification evidence, and remand for an evidentiary hearing is unwarranted. It contends Serena's identification was confirmatory because she had seen and spoken to defendant on several occasions and was "well acquainted" with him. The State further asserts there is no support in the record that Serena learned about defendant's prior history before identifying his photograph. To the contrary, the State notes Serena only learned of defendant's prior criminal behavior after she identified defendant in the photo obtained by Leo. In addition, it asserts even without Serena's in-court and out-of-court identifications, there was compelling proof identifying defendant as Serena's assaulter, rendering her identifications cumulative. The State points to defendant's admissions to the undercover officer confirming the details of his sexual assault of Serena, the digital forensic testimony regarding Serena's and defendant's phones, and Serena's observations of defendant's tattoo and two cell phones.

Our Supreme Court has observed that "[e]yewitness identification can be the most powerful evidence presented at trial, but it can be the most dangerous too." State v. Delgado, 188 N.J. 48, 60 (2006). As such, a "trial court conducts a Wade hearing to determine the admissibility of the out-of-court identifications," State v. Micelli, 215 N.J. 284, 288 (2013), and to "weed out

12

unreliable identifications," Henderson, 208 N.J. at 302. "The inquiry . . . is whether the identification procedure presented a 'very substantial likelihood of irreparable misidentification' to undermine the reliability of the result as a genuine product of the eyewitness's memory rather than of improper influence." State v. Arteaga, 476 N.J. Super. 36, 60 (App. Div. 2023) (quoting id. at 289).

The Court in Henderson articulated a "revised framework" for obtaining a pretrial hearing to evaluate the admissibility of identification evidence. 208 N.J. at 288. However, when, as here, the alleged suggestive behavior stems from a private actor rather than a state actor, the Chen Court modified the first prong of Henderson to "require a higher, initial threshold of suggestiveness to trigger a hearing." Chen, 208 N.J. at 327. Namely, "a defendant must present evidence that the identification was made under highly suggestive circumstances that could lead to a mistaken identification," as opposed to "simply suggestive conduct" by state actors. Ibid.; cf. Henderson, 208 N.J. at 288 ("[A] defendant has the initial burden of showing some evidence of suggestiveness . . . .").

Explaining this heightened standard, the Chen Court reasoned "we cannot expect that private actors will conform their behavior to police standards they are unaware of. Absent police involvement, then, our principal concern is reliability." 208 N.J. at 326. In Chen, the Court determined a husband's actions

were so "highly suggestive" as to warrant a pretrial hearing because he advised his wife that her attacker might be his ex-girlfriend and showed her multiple pictures of the woman to help her make an identification. Id. at 310, 328-29.

If a defendant satisfies the first prong, "the State must then offer proof to show that the proffered eyewitness identification is reliable, considering both system and estimator variables . . . ." Chen, 208 N.J. at 326; see also Henderson, 208 N.J. at 289. System variables are factors "which are within the control of the criminal justice system," while estimator variables are "related to the witness, the perpetrator, or the event itself—like distance, lighting, or stress." Henderson, 208 N.J. at 247. "Third, the ultimate burden remains on the defendant to prove a very substantial likelihood of irreparable misidentification." Id. at 289. Finally, courts will suppress the identification only if a defendant satisfies this "very substantial likelihood of irreparable misidentification." Ibid.

In contrast, a hearing on identification evidence is not required when the identification is "confirmatory." State v. Pressley, 232 N.J. 587, 592 (2018). "A confirmatory identification occurs when a witness identifies someone he or she knows from before but cannot identify by name." Id. at 592-93. "For example,

the person may be a neighbor or someone known only by a street name." Id. at 593.

In considering defendant's contention of suggestiveness, the court stated:

> Although [Leo] presented [Serena] with an image of defendant and defendant only, [Serena] had familiarity with defendant and had seen his appearance several times prior to [Leo] bringing defendant to her attention. [Serena] knew defendant as the person with whom she allegedly had sexual relations. [Serena] also recalled with specificity a tattoo on defendant's arm that contained the word "king," and it was later determined that defendant does, in fact, have a tattoo on his left arm that reads "loyalty king." Moreover, [Serena] provided the means by which [Leo] was able to contact defendant, as she was the one who provided [Leo] with defendant's telephone number.

Moreover, the court found that because Leo was not a state actor, a higher threshold applied pursuant to Chen. The court stated, "defendant must present evidence of highly suggestive circumstances that could lead to a mistaken identification" and a substantial likelihood of irreparable misidentification. The court determined defendant failed to meet that level of suggestiveness based on Serena's pre-existing familiarity with defendant. Accordingly, the court found Leo's actions were proper and declined to hold an evidentiary hearing.

The record amply supports the trial court's well-reasoned decision finding defendant failed to provide any evidence of suggestiveness—let alone Chen's

A-2722-22

heightened standard of highly suggestive circumstances. We are satisfied the trial court did not misapply its discretion under the facts of this case. The court appropriately determined Serena was familiar with defendant's appearance, having seen and interacted with him on numerous occasions prior to Leo's conduct, which enabled her to be "100 percent certain" in her identification of defendant. Because defendant failed meet the initial burden of the Henderson/Chen framework—that Leo's actions caused Serena to make the identification under highly suggestive circumstances—the court did not err in denying defendant's motion for a Wade hearing.

B.

We next turn to defendant's contention that the trial court erred in giving an identification charge that omitted guidance on how Leo's identification procedure could have impacted Serena's identifications. For the first time on appeal, defendant asserts he was denied a fair trial because the court should have instructed the jury on multiple viewings, showups, and feedback. The State argues the showup and multiple viewing charges only apply to law enforcement conduct, and law enforcement neither conducted a showup nor presented defendant's photograph to Serena multiple times, and therefore, "the factors in the identification charge addressing . . . system variables (i.e., matters within

16

the control of law enforcement) were . . . inapplicable." Moreover, it asserts there is no evidence Serena received feedback when she identified defendant's photograph.

Because defendant did not request a particular identification charge, we review the omission for plain error. In the context of a jury charge, "plain error requires demonstration of 'legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result.'" State v. Montalvo, 229 N.J. 300, 321 (2017) (quoting State v. Chapland, 187 N.J. 275, 289 (2006)).

Our Supreme Court has observed, "[t]here is no question but that 'clear and correct jury instructions are essential for a fair trial' because the jury charge 'is a road map to guide the jury, and without an appropriate charge a jury can take a wrong turn in its deliberations.'" State v. Marshall, 173 N.J. 343, 359 (2002) (quoting State v. Koskovich, 168 N.J. 448, 507 (2001)). "[E]rroneous instructions on material issues are presumed to be reversible error." Ibid. Courts reviewing jury instructions must "examine the entire charge to see whether the jury was misinformed as to the controlling law." State v. Hipplewith, 33 N.J.

17

300, 317 (1960). "The test, therefore, is whether the charge in its entirety was ambiguous or misleading." Ibid.

Defendant first argues the court omitted crucial instructions on "the impact multiple viewings can have on the identification" and "the dangers of showup identification procedures." In essence, he contends multiple viewings and showups are implicated because Leo presented Serena with a picture of defendant prior to the photo array, which pushed her to select defendant's photograph during the BCPO identification. Defendant's argument is unavailing.

The model jury charge for the relevant factors regarding an in-court and out-of-court identification tracks the system variables outlined in Henderson. Model Jury Charges (Criminal), "Identification: In-Court and Out-Of-Court Identifications," at 9 n.34 (rev. May 2020). "In evaluating the reliability of a witness's identification, jurors should consider the circumstances under which [the] out-of-court identification was made, and whether it was the result of a suggestive procedure." Id. at 9. Jurors may consider "everything that was done or said by law enforcement to the witness during the identification process." Ibid. (emphasis added).

Regarding multiples viewings, the jury "may consider whether the witness viewed the suspect multiple times during the identification process and, if so, whether that affected the reliability of the identification." Ibid. The multiple viewings charge provides that if a witness "views the same person in more than one identification procedure it can be difficult to know whether a later identification comes from the witness's memory of the actual . . . event or of an earlier identification procedure." Ibid. A "showup" occurs when a defendant "was the only person shown to the witness at that time." Id. at 10. "Even though such a procedure is suggestive in nature, it is sometimes necessary for the police to conduct a 'showup' or one-on-one identification procedure." Ibid. (emphasis added). "Also, police officers must instruct witnesses that the person they are about to view may or may not be the person who committed the crime and that they should not feel compelled to make an identification." Ibid. (emphasis added).

Here, the court informed the jury that in evaluating the reliability of a witness identification, they should consider "everything that was done or said by law enforcement to the witness during the identification process." However, the showup and multiple viewing charges were not requested by defendant, nor were they applicable under the facts of this case. The showup charge is

A-2722-22

implicated when the police conduct a showup which was not present here. Moreover, law enforcement did not engage in more than one viewing. Notably, Leo is a private actor, not a law enforcement officer. Thus, contrary to defendant's position, Leo's identification procedures did not warrant jury instructions on showups or multiple viewings because there was nothing done or said by law enforcement relevant to these system variables.

Moreover, the court advised the jury that the reliability of Serena's identification can be impacted by other witnesses. Specifically, the court instructed:

> [Jurors] may consider whether the witness was exposed to opinions, descriptions, or identifications given by other witnesses, to photographs or newspaper accounts, or to any other information or influence, that may have affected the independence of her identification. Such information can affect the independent nature and reliability of a witness's identification and inflate the witness's confidence in the identification.

Accordingly, the court appropriately provided the jury with instructions that addressed circumstances in which a private actor, like Leo, may influence a subsequent identification. Therefore, the court did not err in omitting charges on showups and multiple viewings.

Defendant next contends the court omitted the "feedback" jury charge because it is unknown what Leo said to Serena when she identified defendant's

20

photograph. The State contends the feedback charge was not applicable because there is no evidence that Serena received any feedback from Leo or her family as to the accuracy of her identification.

The Henderson Court observed that "feedback affects the reliability of an identification in that it can distort memory, create a false sense of confidence, and alter a witness' report of how he or she viewed an event." 208 N.J. at 255. In contrast to showups and lineups, concerns about feedback apply to conduct by law enforcement and private actors. Id. at 268. The model jury charge on feedback provides that "[f]eedback occurs when police officers, or witnesses to an event who are not law enforcement officials, signal to eyewitnesses that they correctly identified the suspect." Model Jury Charges (Criminal), "Identification: In-Court and Out-Of-Court Identifications," at 11.

Here, defendant fails to identify any evidence suggesting that Leo or Serena's family gave Serena feedback regarding her identification of defendant. Serena testified Leo sent her mother a picture, and her mother then showed her the photograph and asked if she knew the person in the picture. Serena responded that she recognized the man as the person who came to the apartment.

Defendant speculates "it is likely that the protective older brother expressed satisfaction that his social media ruse bore fruit." However, nothing

in the record indicates Serena's family signaled that she correctly identified defendant when she selected his photo. Therefore, absent any evidence indicating Serena received feedback on her identification of defendant, the court did not err in omitting that instruction.

Defendant next asserts the court improperly provided the "database of digital photos" charge because it was irrelevant given that Serena selected a photo from a photo array, not an identification software program. He concedes this extra instruction was "not obviously prejudicial." The State, in turn, asserts defendant's argument fails under the invited error doctrine because the charge was requested by defense counsel at the trial. Moreover, it did not have any impact on the outcome of the case.

The relevant model jury charges require courts to charge the jury with instructions when a database of digital photos or an electronic mugshot was used during an identification procedure. Model Jury Charges (Criminal), "Identification: In-Court and Out-Of-Court Identifications," at 5. In essence, the charge on a database of digital photos guides the jury on pertinent considerations when a witness was presented with photos on a digital screen or page. Id. at 6.

Under the invited error doctrine, mistakes at trial that "were induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal . . . ." State v. A.R., 213 N.J. 542, 561 (2013) (quoting State v. Corsaro, 107 N.J. 339, 345 (1987)). "The doctrine acknowledges the common-sense notion that a 'disappointed litigant' cannot argue on appeal that a prior ruling was erroneous 'when that party urged the lower court to adopt the proposition now alleged to be error.'" Ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 340 (2010)). In other words, the "defendant in some way has led the court into error." State v. Jenkins, 178 N.J. 347, 359 (2004). Notably, the doctrine does not bar a defendant from raising an issue on appeal if "the particular error . . . cut mortally into the substantive rights of the defendant" by "demonstrably impair[ing their] ability to maintain a defense on the merits." State v. Harper, 128 N.J. Super. 270, 277 (App. Div. 1974).

Here, the invited error doctrine applies because defendant requested the instruction on "a database of digital photos" and stated it was "appropriate." However, defendant fails to explain how the extra charge prevented him from maintaining a misidentification or fabrication defense. In fact, defendant

concedes "this extra instruction is not obviously prejudicial." Rather he claims it added a "layer of confusion."

We conclude defendant was not denied his right to a fair trial because the additional charge on "a database of digital photos" was unlikely to have impacted the outcome of this case given the evidence in the record. While this instruction was not relevant because digital photos were not used, defendant has not established that this error mortally cut into his substantive rights.

C.

Finally, we address defendant's argument that the court erred in imposing his sentence. Defendant contends this case should be remanded for resentencing because although the trial court was obligated to impose at least a twenty-year sentence without the possibility of parole for the conviction of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a), the additional ten years was manifestly excessive and unduly punitive. The State counters the court imposed a reasonable and just sentence within the lower range of the Lunsford Act. N.J.S.A. 2C:14-2.

Our review of sentencing determinations is highly deferential. State v. Fuentes, 217 N.J. 57, 70 (2014) (citing State v. O'Donnell, 117 N.J. 210, 215 (1989)). The "review of a sentencing court's imposition of sentence is guided

by an abuse of discretion standard." State v. Jones, 232 N.J. 308, 318 (2018). We do "not substitute [our] judgment for that of the trial court." State v. Burton, 309 N.J. Super. 280, 290 (App. Div. 1998) (citing State v. Roth, 95 N.J. 334, 365 (1984)). "But the deferential standard of review applies only if the trial judge follows the Code [of Criminal Justice] and the basic precepts that channel sentencing discretion." State v. Case, 220 N.J. 49, 65 (2014). "When the aggravating and mitigating factors are identified, supported by competent, credible evidence in the record, and properly balanced, we must affirm the sentence and not second-guess the sentencing court, provided that the sentence does not 'shock the judicial conscience.'" Ibid. (internal citations omitted) (quoting Roth, 95 N.J. at 365).

Defendant maintains the court misapplied mitigating factor fourteen when it afforded the factor "very, very low weight because . . . of the victim's age in this case and the fact that the defendant clearly took advantage of her given her youth." He asserts the court's consideration of Serena's age constitutes double-counting because her age is an element of first-degree aggravated sexual assault. Finally, defendant argues mitigating factor fourteen should have been assigned heavy weight based on the various neuroscientific literature which suggests

offenders in their early-to-mid-twenties "are less blameworthy and more amenable to rehabilitation than older offenders."

The jury found defendant guilty of first-degree aggravated sexual assault, which occurs if a person commits an act of sexual penetration and "[t]he victim is less than [thirteen] years old." N.J.S.A. 2C:14-2(a)(1). A conviction of that offense requires a court to impose a sentence between twenty-five years and life imprisonment with twenty-five years of parole ineligibility. Ibid.

N.J.S.A. 2C:44-1(a) to (b) sets forth aggravating and mitigating factors as criteria courts should consider when determining the appropriate sentence to be imposed on a person convicted of an offense. Under mitigating factor fourteen, courts shall consider whether defendant was under twenty-six years of age when the offense was committed. N.J.S.A. 2C:44-1(b)(14).

We initially observe defendant does not challenge the court's findings on the aggravating factors. Specifically, pursuant to N.J.S.A. 2C:44-1(a)(3), the court applied aggravating factor three—the risk that defendant would commit another offense—based on a psychologist opining defendant's risk to reoffend was "well-above average." It also found factor six—the extent of defendant's criminal record, N.J.S.A. 2C:44-1(a)(6)—given defendant's two previous convictions for similar sexual offenses. The court also found factor nine because

of the need to deter defendant and others from violating the law. N.J.S.A. 2C:44-1(a)(9).

At sentencing, the State argued defendant was not entitled to mitigating factor fourteen because the offense occurred only a month prior to defendant's twenty-sixth birthday. The court disagreed and found defendant was entitled to mitigating factor fourteen. However, it gave this factor very low weight because "defendant clearly took advantage of [Serena] given her youth" and "it was clear and the jury agreed . . . defendant preyed on her . . . being so young."

The court fleetingly referred to the victim's age in assigning low weight to mitigating factor fourteen. However, even if the comment was error and had the court accorded a greater weight, it would not change the court's analysis since the three aggravating factors outweighed the lone mitigating factor. Therefore we discern no error in the imposition of sentence.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2722-22