**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1722-16T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ANTWAN J. HORTON, a/k/a
ANATWAN HORTAN, ANTIONE
JAMESON, ANTIONE JENKINS,
ANTOINE SMITH, ANTOWNE
HORTON, ANTWAN JACKSON,
RASEEN WALLACE, RASHAD
SMITH, RASHEEN WALLACE,
and RAYQUAN SMITH,

    Defendant-Appellant.

_____

        Submitted October 23, 2018 – Decided March 15, 2019

        Before Judges Yannotti, Rothstadt and Gilson.

        On appeal from Superior Court of New Jersey, Law Division, Union County, Indictment No. 10-12-1199.

        Joseph E. Krakora, Public Defender, attorney for appellant (David A. Gies, Designated Counsel, on the briefs).

Michael A. Monahan, Acting Union County Prosecutor, attorney for respondent (Michelle J. Ghali, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

A jury convicted defendant Antwan Horton of second-degree reckless manslaughter, N.J.S.A. 2C:11-4(b)(1), and third-degree attempted aggravated assault, N.J.S.A. 2C:12-1(b)(1). The trial court sentenced defendant on the manslaughter conviction to an extended term of fourteen years in prison, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, and a consecutive four years for the attempted aggravated assault conviction. Defendant appeals his convictions and sentences. For the reasons that follow, we affirm.

I.

Defendant's convictions arose from his participation in a shooting that occurred on August 7, 2008, which resulted in the death of Christopher Cunningham and serious bodily injury to David Rivera. At trial, the State's evidence of the circumstances surrounding the shooting was introduced primarily through Rivera's testimony.

According to Rivera, he and Cunningham were shot based upon a mistaken belief that he or Cunningham had committed a burglary at a home the night before. Rivera testified that he was at Cunningham's residence on the day

2

of the shooting to purchase marijuana and after he left, he was confronted by two men. The shorter of the two started questioning Rivera about a break in at his house around the corner and the theft of a chain and money. Rivera denied that he was responsible for the theft and explained that he had just bought marijuana from a friend, but the shorter man was "frustrated[ and] fed up."

Rivera walked back with the men to Cunningham's house and called Cunningham asking him to come outside to confirm that he was telling the truth. When Cunningham came outside, the shorter man told him about the break-in and theft and stated "I know it's one of you . . . from around here . . . ." While they discussed the matter, an SUV pulled up, and a man "with dreads" exited the vehicle and approached Rivera. The man stated, "you [two] don't want to help my man find his chain." With that, he punched Rivera, striking him in the face, causing him to fall on Cunningham. As Cunningham began to push Rivera off of him, "the two people started shooting."

Shortly after the incident, Rivera gave a statement to police that included a description of the shooters. Two years later he identified a photo of defendant from an array as depicting one of the shooters. Specifically, on July 30, 2010, while at the prosecutor's office, he was shown a group of photos. Initially, Rivera spoke with Detective Christopher DiFabio, who was involved in the

investigation. Then, he met with Detective Harvey Barnwell, who showed Rivera a group of photos from which Rivera chose the photo designated as number three, which was of defendant. Rivera told the detective that defendant was the man who "approached [him] and shot [him]" and that he was "about [eighty] percent sure" about his identification.

Based primarily on Rivera's identification, police arrested defendant. On December 3, 2010, a Union County Grand Jury returned an indictment, charging defendant with first-degree murder, N.J.S.A. 2C:11-3(a)(1) and/or (2) (count one); first-degree attempted murder, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:11-3 (count two); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (count three); and second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count four).

In a May 7, 2012 interview of Rivera that was conducted by defense counsel and an investigator, Michelle Martielo-Grove, Rivera recanted. The investigator's report recorded Rivera's statement as follows.

> [Rivera] stated that the reason he wanted to give [the] following statement, he had been thinking about it for a while and wanted to get it off his conscience. [Rivera] stated that there were certain reasons he picked the picture he picked.
>
> He went on to say he was getting pressured because his friend had died. [Rivera] was also getting

pressured to make everything right. [Rivera] continued by stating that people were telling the police a lot of stories . . . . [Rivera] stated that during the police officer's investigation they were going based on what they heard from . . . Cunningham's girlfriend. . . . [Rivera] insists he does not remember the person's face that committed the crime in question. [Rivera] went on to say he does not know [defendant]. [Rivera] continued by stating that he never saw [defendant] before in his life. [Rivera] also stated that he never crossed paths with [defendant]. [Rivera] stated, . . . "I don't want to send a man to prison for the rest of his life." [Rivera] also stated that if he knew . . . he was the right person [he] would stick to it. . . .

[Rivera] stated he would not care if he was called a rat or anything if he knew he had the right person. . . . [Rivera] stated he was tired of dealing with the situation and wanted to move on from it. . . . [Rivera] stated this was one of the reasons he picked a photo from the lineup when asked by police. [Rivera] went on to say to him he looked the most familiar. However, [Rivera] stated that he never saw [defendant] until the day he went to the police station and saw him in the photo. [Rivera] went on to say that the events that he told the police were factual . . . but it was not true that [defendant] committed the crime in question. [Rivera] continued by stating it was not [defendant] that came toward him in 2008. . . . [Rivera] explained that in his view the police conducted the photo lineup properly. [Rivera] went on to say the police did not try to trick him or try to coerce him to pick a certain picture. [Rivera] related that the police did not do anything improper during the lineup. [Rivera] continued by stating the police also did not try to influence [him] to pick anyone or t[ell] him the suspect was in the lineup. [Rivera] stated the lineup consisted of various photos. Some of the pictures showed a "skinny" and some

5

showed a "fat" person. [Rivera] stated he was not sure how many pictures he was shown. [Rivera] went on to say one person came in the room who did not know anything about the case. [Rivera] stated the only thing that the officer said to him was that one of the six people in the lineup was no longer alive. [Rivera] stated that he had it in his mind if he picked the picture, everything would be over. . . . [Rivera] continued by stating that he wanted the picture that he picked to match the description that he gave the cops in his first interview. [Rivera] stated after he picked the picture of [defendant] the cops did not say he picked the correct guy. [Rivera] stated he cannot say a hundred percent who committed that crime. [Rivera] went onto say he only knew that they (police) made an arrest because he read it in the newspaper.

Prior to trial, defendant moved to suppress Rivera's identification of him from the photo array. After conducting a Wade[1] hearing, Judge Scott Moynihan denied defendant's motion. The trial commenced on February 9, 2016 before Judge Regina Caulfield and concluded on April 29, 2016 when the jury returned its verdict.

Rivera testified at trial that his initial identification of defendant as the shooter was not true. He confirmed that before being shot, he was approached by two men asking about a chain and that he told his friends and Cunningham's

_____

[1] United States v. Wade, 388 U.S. 218 (1967).

girlfriend, Tawana Baker, about what had happened.[2]  However, he testified that he lied to police about defendant being the shooter "[b]ecause [he] just wanted to get it over with."  He explained that the police investigation into the shooting was interfering with his business as a "drug dealer."  He identified defendant as the shooter only in order to stop the investigation.  Rivera stated the following:

> So when they presented me with the pictures, I felt that it was an opportunity for me to get them out of my way. I just picked somebody and hopefully they don't find this person because I wasn't giving up no more information after that.  So my intention was to just pick anybody so I [could] get them out [of] my way and I [could] move on with my life.

Rivera also testified that he disclosed to a former assistant prosecutor, Ann Luvera, that he had made the false identification.

After deliberating for twelve days, on April 29, 2016, the jury convicted defendant of committing the offenses and acquitted defendant of the remaining charges.  Judge Caulfield sentenced defendant on June 10, 2016.  This appeal followed.

## II.

On appeal, defendant specifically argues the following:

---

[2]  Baker also testified at trial as to her recollection of the night of the incident.

A-1722-16T3

POINT I

THE PROCEDURE USED BY THE STATE TO IDENTIFY THE DEFENDANT AS ONE OF THE SHOOTERS WAS UNRELIABLE AND UNDULY PREJUDICIAL.

POINT II

THE TRIAL COURT ABUSED ITS DISCRETION WHERE IT DETERMINED THAT A CAUTIONARY INSTRUCTION WOULD SUFFICE TO CURE THE PIVOTAL ISSUE IN THIS CASE, THAT IS, RIVERA'S CREDIBILITY AS TO HIS PRETRIAL IDENTIFICATION OF THE DEFENDANT.

POINT III

THE TRIAL COURT'S FAILURE TO FULLY UNDERSTAND THE DEFENDANT'S ARGUMENT ABOUT THE NONDISCLOSURE BY THE PROSECUTOR OF RIVERA'S RECANTATION OF HIS PRETRIAL IDENTIFICATION UNDERMINED CONFIDENCE IN THE JURY'S VERDICT.

POINT IV

THE TRIAL COURT'S DENIAL OF THE DEFENDANT'S MOTION TO BAR N.J.R.E. 404(b) EVIDENCE WAS ERRONEOUS WHERE IT FAILED TO SANITIZE THE TESTIMONY OF THE OTHERS REGARDING THEIR CHARACTERIZATION OF THE DEFENDANT'S DEMEANOR.

POINT V

THE TRIAL COURT'S DECISION TO REMOVE A JUROR AFTER SUBMISSION OF THE CASE FOR

8

DELIBERATION WAS AN ABUSE OF DISCRETION WHERE IT DID NOT QUESTION WHETHER THE DELIBERATION PROCESS PROGRESSED TO A POINT WHERE THE SUBSTITUTED JUROR COULD BE ABLE TO FUNCTION AS AN EQUAL MEMBER OF THE PANEL.

POINT VI

WHERE THE TRIAL COURT RELIED SOLELY ON CIRCUMSTANCES SURROUNDING THE CRIMES FOR WHICH THE DEFENDANT WAS CONVICTED IN THIS INSTANCE WITHOUT ARTICULATING WHY THE NATURE OF HIS PRIOR CRIMES REQUIRED THE PUBLIC'S PROTECTION, IT ABUSED ITS DISCRETION IN SENTENCING THE DEFENDANT TO AN EXTENDED TERM.

POINT VII

WHERE THE DEFENDANT WAS NOT THE SHOOTER, THE TRIAL COURT ERRED IN SENTENCING HIM TO CONSECUTIVE TERMS.

III.

We first address defendant's contention in Point I challenging the denial of his Wade motion. He argues that "the photographic array shown to Rivera was constructed in a way that affected the reliability of [his] identification . . . ." According to defendant, the color tone of his photograph differed from the color tones of the other five photographs, and his photo was also the only one that showed facial features not "obscured by a shadow[,]" which made "his eyes,

9

mouth and the center of his face . . . more prominent than the [other] photos." He also contends that "the police detectives interrogated Rivera before they showed him the array in a way that pressured him to select an individual as the suspect," despite Rivera telling police that he could not make an identification because the incident happened so fast. Defendant also asserts that the reliability of Rivera's identification was questionable because Rivera had smoked marijuana prior to the shooting. Finally, he argues that there were multiple inconsistencies in Rivera's testimonies that brought into question the reliability of his identification of defendant as the shooter. We find no merit to these contentions.

At a Wade hearing, a trial court decides whether a witness's identification testimony should be excluded from evidence as unreliable. Wade, 388 U.S. at 241-42; accord State v. Michaels, 136 N.J. 299, 320 (1994). "What is being tested in the preliminary inquiry as to admissibility is whether the choice made by the witness represents his own independent recollection or whether it in fact resulted from the suggestive words or conduct of a law enforcement officer." State v. Farrow, 61 N.J. 434, 451 (1972).

"[A] defendant has the initial burden of showing some evidence of suggestiveness" in the identification proceeding "that could lead to a mistaken identification." State v. Henderson, 208 N.J. 208, 288 (2011). Further,

> the determination can only be reached so as to require the exclusion of the evidence where all the circumstances lead forcefully to the conclusion that the identification was not actually that of the eyewitness, but was imposed upon him so that a substantial likelihood of irreparable misidentification can be said to exist.
>
> [Farrow, 61 N.J. at 451.]

The "evidence . . . must be tied to a system—and not an estimator—variable."[3] Henderson, 208 N.J. at 288-89. "[T]he State must then offer proof

---

[3] System variables are factors "within the control of the criminal justice system . . . ." Henderson, 208 N.J. at 218. They include (1) whether a detective with no involvement in the investigation—a "blind" administrator—was used; (2) whether pre-identification instructions were given; (3) whether the identification procedure was constructed of a sufficient number of fillers that look like the suspect; (4) whether the witness was given feedback either during or after the procedure; (5) whether the witness was exposed to multiple viewings of the suspect; (6) whether the lineup was presented sequentially versus simultaneously; (7) whether a composite sketch was used; (8) whether the procedure was a show-up where "a single suspect is presented to a witness to make an identification." Id. at 247-61.

"[E]stimator variables like lighting conditions or the presence of a weapon, [are factors] over which the legal system has no control." Id. at 218. They include (1) the stress level of the witness; (2) whether a visible weapon was used during the crime; (3) the amount of time the witness viewed the

to show that the proffered eyewitness identification is reliable—accounting for system and estimator variables—subject to the following: the court can end the hearing at any time if it finds from the testimony that defendant's threshold allegation of suggestiveness is groundless." Id. at 289. "Suggestiveness" refers to "inappropriate police conduct" that is capable of resulting in inaccurate and unreliable identification by an eyewitness. Id. at 218. "[I]f after weighing the evidence presented a court finds from the totality of the circumstances that defendant has demonstrated a very substantial likelihood of irreparable misidentification, the court should suppress the identification evidence." Id. at 289.

With these principles in mind, we turn to the Wade hearing in this case, at which DiFabio, Barnwell, and Rivera testified about the procedures used during Rivera's out-of-court identification of defendant. In addition to their testimony, among the other evidence considered by the court was defense counsel's

---

suspect; (4) the lighting and the witness's distance from the perpetrator; (5) the witness's age; (6) whether the perpetrator wore a disguise or hat; (7) the amount of time that passed between the crime and the identification; (8) whether the witness and perpetrator were of different races; (9) whether the witness was exposed to co-witness feedback; and (10) the speed with which the witness made the identification. Id. at 261-72

investigator's report about Rivera telling her he did not know who shot him, and a video recording of the identification process.

DiFabio testified that police initially interviewed Rivera on August 7, 2008, soon after the incident and then he re-interviewed him on April 28, 2010. Prior to April 28, 2010, DiFabio stated that he interviewed Cunningham's girlfriend and she stated that she had a conversation with Rivera shortly after he got out of the hospital and he told her his understanding of the incident. DiFabio explained that at the time of the April 28 statement, Rivera was incarcerated. Based on his statement, detectives conducted an investigation that allowed them to identify defendant's address and develop a photo array to show Rivera. On July 30, 2010, Rivera went back to the Prosecutor's Office to look at photographs obtained from an investigation based on his earlier statement. DiFabio explained that they "looked for a photograph that was the clearest image of [defendant]. And then . . . told [a Sheriff's Officer] to give [them] . . . similar photos of [defendant] in the format that she uses." He further testified that he thought Rivera "felt fear from all ends, all angles of people. He didn't know who to trust."

Barnwell testified concerning the photo array procedure used at Rivera's July 30, 2010 identification. He explained that during the recorded photo array,

he showed Rivera one photo at a time, sequentially, per the Attorney General

Guidelines. The recording of Barnwell's interaction with Rivera that Judge

Moynihan considered contained the following exchange:

> [BARNWELL]: Did you view each of the photographs one at a time?
>
> [RIVERA]: Yes, I did.
>
> [BARNWELL]: Did you recognize anyone in the photographs as being the person you saw — one of the persons that shot at you on August 7, 2008, or was present while you were shot?
>
> [RIVERA]: Yes.
>
> [BARNWELL]: What was the number of the photograph that you recognized?
>
> [RIVERA]: Number [three].
>
> [BARNWELL]: Why did you select photo number [three]?
>
> [RIVERA]: Um, um, what I stated earlier. I believe that's the person that approached me that night.
>
> [BARNWELL]: Earlier you said that you're certain.
>
> [RIVERA]: I'm certain. Yes, I'm certain.
>
> [BARNWELL]: You're still certain?
>
> [RIVERA]: I'm still certain that that's the man that approached me.

A-1722-16T3

[BARNWELL]: That approached you the night?

[RIVERA]: The night.

[BARNWELL]: What did he do? He approached you.

[RIVERA]: Yes. I was walking. He came up from somewhere and started talking to me.

[BARNWELL]: Okay.

[RIVERA]: He was talking for, you know, a pretty while.

[BARNWELL]: How certain are you that this is the person that you saw on August 7th, 2008?

[RIVERA]: Percentage wise?

[BARNWELL]: Yes, sir.

[RIVERA]: Say about [eighty] percent.

[BARNWELL]: Did I or anyone else try to influence or suggest to you in any way that you should select this photograph?

[RIVERA]: No, you haven't.

[BARNWELL]: Did I or anyone else try to influence or suggest to you in any way that you should select any other photograph?

[RIVERA]: No, you haven't.

[BARNWELL]: Did I or anyone else tell you that other witnesses in this case selected or failed to select a particular photograph?

15

[RIVERA]: No, you didn't.

[BARNWELL]: Have I or anyone else told you that the photograph that you selected is the person who committed the crime under investigation?

[RIVERA]: No, you haven't.

[BARNWELL]: After reviewing the written statement and making any additions, deletions, corrections that you want, will you sign and swear to the truthfulness of the statement?

[RIVERA]: Yes, I will.

At the Wade hearing, Rivera, who was incarcerated for unrelated charges at that time, testified that he did not tell "the entire truth" when he gave his initial statement to police in 2008 because he was concerned about "nam[ing] people [he] was with" and because he "knew he had drugs . . . and didn't want to go to jail for that." He asserted that he attempted "to make up a story close to the events [that would lead the police to] a dead end." He confirmed that he told the truth for the most part in 2010 and testified in detail to the events on the night he was shot consistent with what he stated during that interview. When he reached the point of when the shooting began, he stated he was shot by the "guy that came out [of] the car [a]nd the person that [was] talking to" him and Cunningham. As he reviewed the statement taken from him by the defendant's investigator, Rivera repeatedly stated that he "never said that [defendant] was

16

the person" who shot him, although he conceded he did "point[]" to a picture identifying him as the shooter. However, prior to reviewing the photo array, Rivera stated he had no recollection of what the shooter looked like, although he identified defendant's photo as being one of the shooters.

After considering the evidence, Judge Moynihan placed his findings on the record on August 22, 2013. The judge reviewed the applicable legal principles, and acknowledged that he "initially found that defendant proffered sufficient evidence of suggestiveness" to warrant a Wade hearing based on the different color tone of defendant's photograph from the other photos in the array. However, he stated that in making his initial decision he relied upon photographs that were "attached to . . . defendant's brief." After seeing the actual photos during the hearing, however, he found that the difference in the array's photos were "not as stark" and that the color tones were "not that much different." He concluded that based on Rivera's testimony and his observation of the photographs, there was no issue created by the alleged different tones and that "[t]he defense and initially the [c]ourt made much more of the differences than did Rivera." The judge determined that based on "Rivera's credible testimony that defendant's photo did not really stand out from the fillers [and e]ach photo

had [its] own distinct characteristics[, and t]he array was not suggestive as to defendant's photo alone."

Judge Moynihan found that the identification procedure was administered double-blind, and the detective's pre-identification instructions were proper. The judge also found there was no evidence that anyone "provided feedback at any time to Rivera." He concluded that "there [was] no evidence that any pressure was exerted by law enforcement to make an identification of . . . defendant." The court noted that DiFabio told Rivera prior to his identification of defendant, "If you don't know you don't pick. It's okay. If you know you pick. You don't know it's not going to harm the case. If you don't know don't pick." DiFabio also told Rivera that "[t]he person may or may not be in there."

Judge Moynihan observed that there was no doubt that Rivera's identification was made with "[eighty] percent" confidence as it was recorded. He also found that "there was [no] danger of mug shot exposure or mug shot commitment" and "[a]s to the sequential line up, Rivera was shown the photos one at a time" and the process was not suggestive.

Turning to the system and estimator variables, the judge stated "[w]hile the only system variable [he found was] the almost non-existent line up construction variable," he "review[ed] the estimator variables so [that] the

A-1722-16T3

record [would be] complete." He discussed estimator variables such as Rivera's stress, weapon focus, duration, distance, lighting, witness characteristics, characteristics of the perpetrator, memory decay, and influence by private actors.

Addressing Rivera's marijuana use on the day of the incident, the judge observed that there was "no expert testimony on the effects a dime bag of marijuana would have on a regular user" or "that regular marijuana use between 2008 and 2010 would impact his ability to perceive or recall." He concluded that, in any event, there was no evidence "that Rivera was impaired to the extent that it would impact his ability to perceive that day" as "[h]e certainly had his wits about him as he parried the accusations [of robbery by] the man who approached him."

Turning to the role of private actors that may have influenced Rivera, which could lead to the differences in his statements to police, Judge Moynihan observed that "[a]lthough Rivera changed the circumstances leading up to the shooting between 2008 and 2010, perhaps engendered by what he learned of the chain robbery [from Baker], the general description of the suspects did not change." He also explained that "[t]here is no real connection between that information and Rivera's identification. All those facts may be relevant to

Rivera's credibility and perhaps to a [Rule 404(b)] hearing regarding the robbery of the chain [but t]here is no nexus to the photo array procedure." Ultimately, the judge determined that "almost all the variables that support defendant's motion are estimator variables."

Judge Moynihan concluded that while there were factual issues about Rivera's identification of defendant that a jury would have to resolve. He stated:

> [T]he [S]tate has proffered sufficient evidence to find that the identification was not the result of suggestive police practices, and that considering the totality of the circumstances the identification was reliable. This [c]ourt also finds that this is not the case where there is a very substantial likelihood of irreparable misidentification. . . .
>
> [T]he great majority of system and estimator variables point to the fact that this . . . while certainly not a perfect or even excellent identification, it was sufficiently reliable to warrant letting a jury ultimately decide [its] worth.

Based on Judge Moynihan's ruling, Barnwell testified at trial regarding the procedure used when conducting the presentation of the photo array that led to Rivera's identification of defendant. The detective stated that he "read [the photo display instruction] out loud, and at the bottom [he] signed it and . . . Rivera signed it." He denied threatening Rivera at any point and also denied promising Rivera anything in return for his identification. During his testimony,

the video recording of Rivera's identification was played to the jury. Rivera, as noted, testified that he lied to police when he identified defendant's photo as depicting one of the shooters.

We begin our review by acknowledging the great deference we accord a trial judge's findings regarding the impermissible suggestiveness of the identification procedure. State v. Adams, 194 N.J. 186, 203 (2008). A "trial court's findings that photographic identification procedures were reliable [will not] be disturbed if there is sufficient credible evidence in the record to support the findings." Ibid. The trial court's findings are "entitled to very considerable weight." Ibid. (quoting Farrow, 61 N.J. at 451). See also State v. Wilson, 362 N.J. Super. 319, 327 (App. Div. 2003). The identification may be admitted into evidence as long as "there is sufficient credible evidence in the record to support the findings." Adams, 194 N.J. at 203.

Applying this deferential standard, we conclude that defendant's challenge to the judge's findings are without merit. Judge Moynihan applied the proper legal analysis, and his findings were supported by sufficient credible evidence. We have no cause to disturb defendant's conviction based upon the result of the Wade hearing. Similarly, the fact that Rivera testified differently at trial about his identification does not warrant revisiting what happened pre-trial. As with

21

any pre-trial hearing, its outcome is determined by the evidence presented at that time, not during an ensuing trial. See State v. Robinson, 200 N.J. 1, 15 (2009).

IV.

Next, we consider defendant's contention in Point II that the trial court erred by denying his motion for a mistrial that he made after "DiFabio's inadmissible hearsay testimony that Rivera 'feared for his safety' as a result of Rivera's pretrial identification of defendant as the shooter." He argues that the trial court abused its discretion by determining that a curative instruction was sufficient to cure the prejudicial effect of the testimony. Relying on State v. Frisby, 174 N.J. 583 (2002), defendant contends the comment related to Rivera's credibility as a witness was "pivotal" to his guilt since Rivera was the only eyewitness of the August 7, 2008 incident, and therefore a reversal is warranted.

During DiFabio's testimony at trial and in response to a question as to Rivera's "attitude and demeanor when he gave [his] statement[,]" DiFabio stated, "I think he was a little scared at first. Little hesitant. He asked if he needed a lawyer or not." Based on that testimony, defense counsel objected and moved for a mistrial, arguing that the detective was impermissibly trying to create an "inference it was [defendant] that created the fear for [Rivera's] safety," and that fear was the reason why Rivera "changed everything he had to say, kept

changing back and forth."  According to counsel "[i]f the jury hears that alone that could have an impact on the outcome of the trial and that is impermissible."

Judge Caulfield denied the motion, but agreed to strike the testimony.  She observed that "[s]ometimes [jurors] hear things they shouldn't but overall in a long trial when they've heard a lot of evidence, I really don't think there's any reason to think this will stand out, or any reason to think they will not follow my instructions as the case law says."  In addition, the judge indicated she would also

> instruct [DiFabio] not to say anything about anybody feeling fear, scared, whatever.  There is no testimony by Rivera . . . . [about being] scared of anything or anybody . . . .  He said I lied on purpose.  I picked that picture out so I could be left alone to do my drug dealing. Nothing to do with being scared.  This is really a very, very isolated comment in a trial that's been long.  So that's one of the reasons among others I'm denying the motion for mistrial.  Certainly there isn't any chance of a manifest injustice or I think any injustice at all.

When trial resumed, the judge instructed the jury:

> Before we continue with the officer's testimony I want to give you an instruction and it does have to do with the last part of the officer's testimony — and I'm not going to repeat it in its entirety, but it was about . . . Rivera coming in and meeting with the detective on September 10, 2010, I believe, and something about being fearful.  That's struck even though I know I just repeated it.  I want to make sure you understand what I'm striking.  It's like it never even happened.  It's gone, like that commercial.  It might be somehow in the back

23

of your brain there, but you can't consider it. You can't think about it. You can't even speculate about it. It is like it never happened, please. It's gone. And also there's no evidence of any kind that [defendant] had anything to do with any thoughts whatever . . . Rivera may have expressed September 10, 2010. I don't know what he was talking about. It's struck anyway, has nothing to do with [defendant]. Thank you for following that instruction. I trust that you will.

We will defer to a trial court's ruling on a motion for a mistrial, "absent an abuse of discretion . . . ." State v. Harvey, 151 N.J. 117, 205 (1997). "Whether an event at trial justifies a mistrial is a decision 'entrusted to the sound discretion of the trial court.'" State v. Smith, 224 N.J. 36, 47 (2016) (quoting Harvey, 151 N.J. at 205). Further, the decision as to whether inadmissible evidence may be cured by a cautionary or limiting instruction, or instead requires the more severe response of a mistrial, "is one that is peculiarly within the competence of the trial [court], who has the feel of the case and is best equipped to gauge the effect . . . on the jury in the overall setting." State v. Winter, 96 N.J. 640, 646-47 (1984). Thus, a decision to deliver a curative instruction instead of declaring a mistrial is addressed to the sound discretion of the trial court. State v. Denmon, 347 N.J. Super. 457, 464 (App. Div. 2002).

In deciding whether to grant a mistrial or issue a curative instruction, a trial court is circumscribed by controlling legal principles. State v. Gilchrist,

24

381 N.J. Super. 138, 143 (App. Div. 2005). One of those, a bedrock principle of our criminal jurisprudence, is that the defendant is entitled to a fair trial and the court must protect that right. State v. Williams, 184 N.J. 432, 443 (2005) (citing Strickland v. Washington, 466 U.S. 668, 684-85 (1984)). Another guiding principle is that mistrials should only be declared "with the greatest caution, under urgent circumstances, and for very plain and obvious causes." State v. Loyal, 164 N.J. 418, 436 (2000) (quoting United States v. Perez, 22 U.S. 579, 580 (1824)). Accordingly, trial courts should exercise their discretion to grant a mistrial "only in those situations which would otherwise result in manifest injustice." State v. Rechtschaffer, 70 N.J. 395, 406 (1976) (quoting State v. DiRienzo, 53 N.J. 360, 383 (1969)). Where a court decides to issue a curative instruction rather than grant a mistrial, absent any evidence to the contrary, we presume a jury to have followed those instructions by the trial court. State v. Manley, 54 N.J. 259, 271 (1969).

Here, we conclude that Judge Caulfield properly exercised her discretion in denying defendant's motion for a mistrial and opting to give a curative instruction instead. It was not apparent from DiFabio's testimony that he was commenting on Rivera being afraid of defendant. He testified, "I think [Rivera] was a little scared at first. Little hesitant. He asked if he needed a lawyer or

not." There are a number of explanations for Rivera being "scared" to speak with the detectives, including his own criminal liability, given that Rivera was purchasing marijuana on the night of the incident. Nonetheless, if any error occurred, the trial court instructed the jury that DiFabio's comment was "struck" and that the jury could not "consider it," "think about it," or "even speculate about it." We agree that the more severe response of granting a mistrial was not warranted here. See Loyal, 164 N.J. at 436 (stating mistrials should only be declared "for very plain and obvious causes" (citation omitted)).[4]

## V.

We turn next to defendant's contention that "that [Judge Caulfield] should have declared a mistrial because the prosecutor withheld material evidence

---

[4] Defendant's reliance on Frisby is inapposite. That case dealt with a police witness's use of hearsay testimony by a third-party to bolster another witness's testimony over a defendant's. There, the officer testified that he found another suspect more credible than defendant because of what others told him. Frisby 174 N.J. at 591-92. The Supreme Court noted that "there are circumstances in which an officer will be allowed to testify, based generally on hearsay evidence, to explain the course of his or her investigation." Id. at 592. "However, 'when the officer becomes more specific by repeating what some other person told him concerning a crime by the accused, the testimony violates the hearsay rule' and implicates defendant's Sixth Amendment confrontation rights." Ibid. (quoting State v. Bankston, 63 N.J. 263, 268 (1973)). No such Confrontation Clause concerns arose in this case from DiFabio's opinion as whether Rivera acted out of fear.

favorable to him in violation of <u>Brady</u>.[5]"  He further contends that the judge erred in denying his motion for a judgment of acquittal under <u>Rule</u> 3:18-1, when he reasserted at the end of the State's case that the <u>Brady</u> violation required a mistrial.

According to defendant, the <u>Brady</u> violation occurred when the State did not inform his counsel that Rivera had told the former assistant prosecutor that he lied when he identified defendant.  Defendant argues that "[c]ontrary to the trial court's reasoning, [he] did not complain that he was unaware of Rivera's recantation of his pretrial identification; instead, [he] complained that the prosecutor erred by not disclosing . . . her knowledge of the recantation and when she knew it."  He contends that the timing of the disclosure is material because "[i]f Rivera told the prosecutor he lied before the May 7, 2012 interview, the information would have bolstered the reliability of his recantation to . . . defendant's investigator and ultimately his trial testimony and would have further discredited his pretrial identification."

At trial, when Rivera stated that he told Ann Luvera that he gave the detectives false information, defense counsel objected.  He stated that the assistant prosecutor trying the case "never revealed it to me that this witness was

---

[5]  <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

a problem for them in giving this testimony" and the prosecutor never gave him any report indicating that Rivera told them he lied when he identified defendant's photograph. Counsel argued that "when a prosecutor . . . learns of information that diminishes the proofs of their case, for example, that this witness was going to say what he told about the identification was not true, . . . that should be revealed" to the defense.

In response, the prosecutor argued he did not keep any information from the defense. He stated that he first learned about Rivera's intention to recant his identification from the "defense's investigator's report that he was disavowing that identification." Before that report, which he obtained from defense counsel, he "had no clue he was going to say it was a lie" and was surprised by Rivera's testimony, although based on the report, he

> had a suspicion that [Rivera] was going to be consistent with the defense investigator's report and consistent with the <u>Wade</u> hearing, which just to be clear at the <u>Wade</u> hearing there was all kinds of testimony about the defense investigator's statement. It became part of that <u>Wade</u> hearing record.

The judge ruled that there was no <u>Brady</u> violation because defense counsel was aware from the investigator's report that Rivera already stated that he lied about his identification of defendant. She rejected defendant's argument that

because the State had Barnwell ready to testify at a <u>Gross</u>[6] hearing should Rivera in fact recant, it did not mean that the State had knowledge about that possibility different from what defendant already knew.  We discern no error in the judge's decision.

The State has a "constitutional obligation to provide criminal defendants with exculpatory evidence in the State's possession." <u>State v. Marshall</u>, 148 N.J. 89, 154 (1997).  "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." <u>State v. Knight</u>, 145 N.J. 233, 245 (1996) (quoting <u>Brady</u>, 373 U.S. at 87).

In order to establish a claim under <u>Brady</u>, a defendant must show:  "(1) the prosecution suppressed evidence; (2) the evidence is favorable to the defense; and (3) the evidence is material." <u>State v. Martini</u>, 160 N.J. 248, 268 (1999).  Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>State v. Parsons</u>, 341 N.J. Super. 448, 455 (App. Div. 2001) (quoting <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985)).  "The mere

---

[6] <u>State v. Gross</u>, 121 N.J. 1 (1990).

possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." United States v. Agurs, 427 U.S. 97, 109-10 (1976). Further, the rule only applies where, after trial, defendant discovers "information which had been known to the prosecution but unknown to the defense." Id. at 103.

We conclude there was no basis to declare a mistrial or enter a judgment of acquittal as there was no Brady violation. See Harvey, 151 N.J. at 205. As the trial judge found, defendant's counsel was aware of Rivera's recantation prior to Rivera testifying at trial. See Agurs, 427 U.S. at 103. Defendant's argument that there is a distinction between Rivera recanting his identification because he was unsure of the perpetrator's identity and him intentionally lying is meritless. In either event, there was no evidence that the prosecutors were privy to information regarding Rivera's recantation beyond what was in the defense's investigator's report or that suggests that the distinction was material or that the timing of defendant's knowledge of the recantation would have changed the outcome of the trial as defense counsel had ample opportunity to and did thoroughly attack Rivera's credibility. See Parsons, 341 N.J. Super. at 455.

## VI.

We turn to defendant's contention in Point IV that the trial court's denial of the defendant's motion to bar Rule 404(b) evidence was erroneous.  The challenged evidence came from the testimony of four witnesses, Yasmeen Scudder, Sayeed Dean, Chaz McCargo, and Cedric Parrish.  The trial court admitted their testimony as proof of defendant's motive or intent.

Scudder, defendant's ex-girlfriend who was living with him at the time of the incident, testified that the night of August 6, 2008, a group of six black men, two of them armed with weapons, followed her into her apartment and committed a burglary.  After the men left and defendant arrived at the apartment, Scudder told him what happened and testified that defendant was upset and mad.

Dean, an acquaintance of Cunningham, testified that he was riding his bike on the night of August 6, 2008, when he ran into defendant and Scudder, who were with two other men.  Defendant asked Scudder if Dean was the person that broke into the apartment, to which Scudder responded that he was not.  Dean described defendant as being mad.

McCargo, a tenant in the building where defendant lived, testified that on August 6, 2008, while at work he received a call from his cousin and roommate, Parrish, who told him there was an emergency at their apartment.  In order to

31

find out what happened, McCargo spoke to the tenants in the building, including defendant, who claimed that his apartment had also been broken into. According to McCargo, defendant was irate and screamed at him that a chain had been stolen from his apartment, and accused McCargo and Parrish as being responsible for his missing chain. In order to deescalate the situation, McCargo testified that he gave defendant his phone number and defendant allowed him and his cousin to leave. Parrish also testified at the trial and, although he had memory issues, he stated that his apartment unit was broken into, and that defendant was mad when speaking to him and McCargo on August 6, 2008.

Defendant contends that Judge Caulfield "failed to sanitize the testimony of the other[] [witnesses] regarding their characterization of . . . defendant's demeanor." He explains that, "[t]he State asserted that certain testimony showing the defendant had confronted several persons about a robbery occurring in his apartment building hours before the shooting should be admitted to show he had a motive to confront Cunningham and Rivera." Defendant conceded that Rivera's testimony concerning the robbery was admissible, however, he argues that the motion court should have barred the testimony of all other witnesses concerning the robbery as cumulative and unduly prejudicial. We disagree.

We accord great deference to a trial court's ruling on the admissibility of evidence under Rule 404(b). State v. Barden, 195 N.J. 375, 390 (2008). We will only disturb a trial court's ruling "where there is a 'clear error of judgment' . . . 'with respect to [the required] balancing test' . . . ." State v. Marrero, 148 N.J. 469, 483 (1997) (quoting State v. DiFrisco, 137 N.J. 434, 496-97 (1994)).

Under Rule 404(b), evidence of "other crimes, wrongs, or acts" is inadmissible as evidence of a person's bad character or criminal predisposition; however, such evidence is admissible to prove "motive, opportunity, [or] intent . . . when such matters are relevant to a material issue in dispute." N.J.R.E. 404(b). See State v. Stevens, 115 N.J. 289, 300-01 (1989). In order to justify admission, the evidence must (1) "be admissible as relevant to a material issue"; (2) "be similar in kind and reasonably close in time to the offense charged"; (3) "be clear and convincing" evidence of the other crime or bad act; and (4) have probative value that is not "outweighed by its apparent prejudice." State v. Cofield, 127 N.J. 328, 338 (1992) (citation omitted).

Here, we conclude that Judge Caulfield properly analyzed the Cofield factors before admitting evidence of defendant's prior statements and demeanor regarding the robbery of his home. As to the first Cofield factor, the judge found

"defendant's alleged motive for the shooting of both Rivera and Cunningham is genuinely in dispute. The evidence indicating that defendant was seeking to find out who had broken into his home, and stolen from him, is clearly relevant to such motive." "[I]t directly bears upon defendant's motive for the double shooting."

"In criminal prosecutions, New Jersey courts generally admit a wider range of evidence when the motive or intent of the accused is material," as it is here, and "[o]ther-conduct evidence [has] been found probative of intent and motive." State v. Covell, 157 N.J. 554, 565 (1999). We agree with the judge's conclusion that the evidence went towards defendant's motive.

Turning to the second prong, the trial court determined that it was not applicable under Cofield because "the State seeks to introduce this 'other acts' evidence for the purpose of establishing motive, [and] the second factor is deemed satisfied even if the charged offenses and the prior acts are factually dissimilar." We agree. "When motive, rather than pattern, is sought to be shown through other-crime evidence, . . . similarity between the alleged other act and the one for which defendant is currently on trial is not a requirement for admissibility." State v. Collier, 316 N.J. Super. 181, 194 (App. Div. 1998); see

also State v. Rose, 206 N.J. 141, 160 (2011); State v. Castagna, 400 N.J. Super. 164, 179 (App. Div. 2008).

As to the third Cofield factor, the judge found "that the proffered testimony from Scudder, Dean, McCargo and Parrish . . . when considered independently and collectively, meets the third prong of the Cofield test." She stated:

> Parrish and McCargo testified that [d]efendant made accusations concerning their suspected knowledge of the robbery. Dean, Scudder and Parrish provide consistent testimony concerning the bicycle incident that occurred outside of [the apartment], although it was obvious to the [c]ourt that Scudder and Parrish were reluctant to do so. The fact that the testimony of the witnesses presented by the State is largely consistent concerning defendant's accusations about those he perceived either had information about the break-in, or who were involved, convinces the [c]ourt that the clear and convincing threshold has been satisfied.

The judge acknowledged that "Dean did indicate that his marijuana has affected his memory and Parrish claims that a head injury has led to memory loss." She explained however, that while "[t]hese limitations may cause the jurors to attach little weight to their testimony . . . it does not show that the State has failed to" meet its burden.

Our review of the judge's findings as to the third <u>Cofield</u> factor "is limited to confirming only that 'those findings are supported by sufficient credible evidence in the record.'" <u>State v. Hreha</u>, 217 N.J. 368, 382 (2014) (quoting <u>State v. Elders</u>, 192 N.J. 224, 243 (2007)). Here, the judge's findings are amply supported by the record.

As to the fourth <u>Cofield</u> factor, the judge found the evidence's potential for prejudice did not outweigh its probative value. Conducting the necessary balancing test, the judge stated that "[t]here can be little doubt that the proffered evidence is probative as it highlights a potential motive for [d]efendant to commit the shootings." She recognized that the evidence was prejudicial to defendant's case but stated that "the question is not whether the introduction of such evidence is prejudicial but whether the probative value of such evidence is outweighed by its prejudice." The judge found the following:

> [T]he evidence the State seeks to introduce through the testimony of the various witnesses is more probative than prejudicial. While there may be some overlap in the testimony, this does not render the evidence cumulative or overly prejudicial. Each witness encountered defendant at a different time — Dean while riding past on his bicycle, Scudder when defendant learned of the break-in and, later, when Dean was stopped while riding by on his bike, and McCargo and Parrish about their possible involvement in the incident at about the same time Dean was questioned. Later, Rivera was approached by defendant when it

seems he was dissatisfied with the responses of Dean, McCargo and Parrish. All of the testimony sought to be introduced is directly relevant to the alleged motive for the shootings and concern incidents that occurred shortly after the break-in. It should be noted that none of defendant's acts and/or conversations with Dean, McCargo, Parrish and even Rivera are criminal in nature but, regardless, must be analyzed under Rule 404(b) and Cofield . . . .

The judge observed that it was defendant's burden to prove that the proffered testimony was overly prejudicial and "that such evidence will only be excluded if there is a very strong demonstration that its admission would be prejudicial." She also observed that in light of Rivera's then expected inconsistent testimony, defendant would seek to impeach his testimony and therefore "the State has the right to call [the other witnesses] to corroborate the testimony of Rivera" and to "provide[] additional and admissible evidence of defendant's alleged motive for the shootings," which was "stronger evidence of said motive . . . ." As such, the judge admitted the evidence but stated that she "will of course provide an appropriate limiting instruction[7] when each witness testifies as well as in the final instructions to the jury."

---

[7] At trial, the judge gave the following limiting instruction, which both parties agreed to when each of the above-named witnesses testified:

We conclude there was no "clear error of judgment." in the judge's ruling. Marrero, 148 N.J. at 484. The judge conducted the appropriate analysis of the proffered evidence and although she recognized that the witness' testimony could be prejudicial, the judge's ruling demonstrated a correct understanding that "[t]he mere possibility that evidence could be prejudicial does not justify its exclusion[,]" and "certain types of evidence, including evidence of motive or intent, 'require a very strong showing of prejudice to justify exclusion.'" State v. Long, 173 N.J. 138, 164 (2002) (first quoting State v. Morton, 155 N.J. 383, 453-54 (1998); then quoting State v. Koskovich, 168 N.J. 448, 486 (2001)). We discern no error in the judge's Rule 404(b) ruling.

## VII.

In Point V, defendant contends that his right to a fair trial was compromised by the trial court's substituting jurors during deliberations. After

---

This testimony has been admitted and may be considered by you but only for a limited purpose. You may consider this testimony only for the purpose of establishing any motive [defendant] may have had to commit the crimes with which he is charged. You may not consider the testimony to conclude that [defendant] is a bad person or that he has a propensity to commit crimes. Again, the testimony you have just heard may only be considered by you to establish a possible motive by [defendant] and for no other purpose.

A-1722-16T3

deliberations began on April 12, 2016, juror four became sick and was replaced with an alternate on April 19, 2016. Later, juror five also had to be excused and replaced with an alternate because of a pre-planned vacation.

Before juror number five was excused, the jury delivered a note on April 20, 2016, to the trial court that stated:

> We have reached verdicts for some of the charges. We have been about evenly split on some of the others. All of our time has been spent trying to resolve the ones we are split on, with very little change in the votes. In addition, there are likely [two to three] jurors who are very firm on each of the two sides. Please advise how to proceed.

As a result, defendant argued that because the jury indicated it reached a partial verdict, it was "unrealistic to think that a new juror would be able to go in there and [the other jurors] would kind of erase their thinking on where their deliberations were at that time, and . . . start anew . . . ." The judge rejected defendant's argument, explaining that "[a]ll jurors are presumed to follow instructions[,]" and that she would instruct the jury on the issue.

When the jury was brought back into the courtroom, on April 26, 2016, the judge explained to the jury why the two jurors had been excused and replaced and she instructed jury as follows:

> So, as of this moment you're a new jury and you must start your deliberations all over again. The parties have

the right to a verdict reached by [twelve] jurors who have had the full opportunity to deliberate from start to finish.  The alternate juror has no knowledge obviously of any earlier deliberations.  Consequently, the new deliberating jury must start over at the very beginning of deliberations.   Each member of the original deliberating jury must set aside and disregard whatever may have occurred and anything which may have been said in the jury room following my original instructions to you.  You must give no weight to any opinion expressed by [j]uror [five] . . . during deliberations before she was excused.  Together as a new jury you must consider all evidence presented at trial as part of your full and complete deliberations until you reach a verdict.

Now, remember back it was Wednesday, April 20, you had sent out a note and you had indicated and I have the note here and I'll not read all of it.  It says, "We've reached verdicts on some of the charges."  And it goes on to talk about some other details.  So forget that.  Whatever that is, whatever it was or wasn't, whatever reached verdicts, they're gone.  It's like it never even happened. . . .  You have to put that aside.  You can't say oh, great.  We have this done but let's talk about that. That would be unfair to the defendant, to the State, to all parties.  And that's why that charge I read to you is so critical, so important.

So . . . whatever your thinking was, whatever you talked about, decided, just put it out of your minds.  It's gone.  It's over.  You're a brand new jury.  Okay?

So, thank you.  We're going to send the evidence in in just a moment and please start your deliberations.

A-1722-16T3

After the instruction, defendant requested that the judge "voir dir[e the] jury to see if they could do that as [she] instructed them." The judge denied defendant's request.

During deliberations, the reconstituted jury requested a transcript of a witness's audio statement, which the original jury had already requested and received.[8] It also sent out questions and asked for the read back of testimony before reaching its verdict on April 28, 2016.

Defendant argues that the judge's "decision to discharge a juror after submission of the case for deliberation was an abuse of discretion because [she] did not question each juror whether the deliberation process progressed to a point where the substituted juror would be able to function as an equal member of the panel." Again, we disagree.

"Our review of a trial court's decision to remove and substitute a deliberating juror because of an 'inability to continue,' pursuant to Rule 1:8-2(d)(1), is deferential. We will not reverse a conviction [on that basis] unless the court has abused its discretion." State v. Musa, 222 N.J. 554, 564-65 (2015).

---

[8] The judge even remarked that this is "basically the same request the jurors made last week but this, of course, is a brand new jury so they've requested that again and we have the copies."

Rule 1:8-2(d)(1) provides for the substitution of a juror if a juror is discharged because of an inability to continue. When there is a substitution of a juror, the court must "instruct the jury to recommence deliberations and shall give the jury such other supplemental instructions as may be appropriate." R. 1.8-2(d)(1). The Rule "delicately balances two important goals: judicial economy and the right to a fair jury trial." State v. Ross, 218 N.J. 130, 146 (2014) (quoting State v. Jenkins, 182 N.J. 112, 124 (2004)). As compared to substituting jurors, "[d]eclaring a mistrial imposes enormous costs on [the] judicial system, from the expenditure of precious resources in a retrial to the continued disruption in the lives of witnesses and parties seeking closure." Jenkins, 182 N.J. at 124.

The juror substitution procedure does not "offend [the] constitutional guaranty of trial by jury." Ross, 218 N.J. at 146 (quoting State v. Miller, 76 N.J. 392, 406 (1978)). "Such a substitution, however, contravenes constitutional norms if it impairs the mutuality of deliberations—the 'joint or collective exchange of views among individual jurors.'" Id. at 146-47 (quoting State v. Williams, 171 N.J. 151, 162 (2002)). "Given the competing interests at stake . . . the trial court must ascertain whether a reconstituted jury will be in a position to conduct open-minded and fair deliberations." Id. at 147. The trial court must

"determin[e] . . . whether a reconstituted jury will meaningfully deliberate." Id. at 151.

Once a court is satisfied through the appropriate inquiry that a juror should be excused and has directed the juror "not to reveal confidential jury communications," the court may consider the duration of the prior deliberations in determining whether to allow the jury to continue its deliberations. Ibid. If, however, a "partial verdict has been rendered or the circumstances otherwise suggest that jurors have decided one or more issues in the case, the trial court should not authorize a juror substitution, but should declare a mistrial." Ibid. If substitution is permitted the court "must instruct the newly composed jury before its deliberations." Ibid.

"[W]hen the circumstances suggest a strong inference that the jury has affirmatively reached a determination on one or more factual or legal issues, the trial court should not substitute an alternate for an excused juror." Ibid.; see also State v. Corsaro, 107 N.J. 339, 344-45 (1987); Jenkins, 182 N.J. at 132-33. The concern being that

> it is unlikely that the new juror will have a fair
> opportunity to express his or her views and to persuade
> others [or] to understand and share completely in the
> deliberations that brought the jurors to particular
> determinations, and [he or she] may be forced to accept

findings of fact upon which he or she has not fully deliberated.

[Corsaro, 107 N.J. at 352.]

That is not to say "however, that a trial court may never substitute an alternate for an excused juror after an initial declaration of a deadlock and a Czachor[9] charge." Ross, 218 N.J. at 153-54. Rather, the court must consider the "totality of the circumstances." State v. Williams, 377 N.J. Super. 130, 150 (App. Div. 2005) (reversing a conviction after "the verdict was arrived at fifty-nine minutes [after a juror substitution, which] corroborate[d] the unrealistic expectation that the jury was capable at that point in time to start deliberations anew"); see also Jenkins, 182 N.J. at 134-35, 137 (finding error caused by the trial court inadvertently eliciting from the substituted juror information about the positions of other jurors regarding the case and therefore permitting the reconstituted jury to deliberate).

The critical issue here was whether the substitute jurors could be full participants in the mutual exchange of ideas after the seated jurors had already sent out their note on April 20, 2016, advising the court of their status. We conclude that the totality of the circumstances adequately supported the judge's

---

9  State v. Czachor, 82 N.J. 392 (1980).

decision.  First, the ultimate verdict was not returned until six days after the substitution of juror five.  Second, while the reconstituted jury deliberated, it was obvious that the jury had begun their deliberations anew by virtue of their asking additional questions and again requesting transcripts and playback of testimony they reviewed before the substitution of the jurors.  The jury's conduct demonstrated that its members followed the trial court's instructions to start over.

## VIII.

Last, we address defendant's contentions about his sentence.  At the time of his sentencing, defendant had already been convicted of third-degree possession of a controlled dangerous substance in 2001, third-degree eluding in 2007, and third-degree eluding in 2008.  Because defendant met the criteria for being a persistent offender, the trial court granted the State's motion to impose a discretionary extended term.  See N.J.S.A. 2C:44-3(a).

In considering the sentencing criteria under N.J.S.A. 2C:44-1, Judge Caulfield found applicable to defendant aggravating factors three, "[t]he risk that the defendant will commit another offense;" six, "[t]he extent of the defendant's prior criminal record and the seriousness of the offenses of which he has been convicted;" and nine, "[t]he need for deterring the defendant and

others from violating the law." N.J.S.A. 2C:44-1(a)(3), (6), and (9). The judge found no mitigating factors. N.J.S.A. 2C:44-1(b). Based on her findings, the judge imposed the fourteen year prison term on the manslaughter charge and the consecutive four year term on the aggravated assault.

Defendant contends that the judge erred when she "imposed an extended term sentence of fourteen years . . . because [she] did not articulate why the objective factors of [his] prior crimes, particularly in relation to the elements and degrees of the offenses, necessitated a need to protect the public." According to defendant, although he had three prior offenses, "they were not crimes of violence, . . . they did not involve the use of weapons and[,] . . . they were not specifically directed at any particular person." Defendant also argues that the judge "erred [when] [she] sentenced [him] to consecutive terms" because he was not one of the shooters. We find no merit to these contentions.

We review a court's sentencing decision under an abuse of discretion standard. State v. Fuentes, 217 N.J. 57, 70 (2014). As directed by the Court, we must determine whether:

> (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the

46

sentence clearly unreasonable so as to shock the judicial conscience."

[Ibid. (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

In our review, we will not "substitute [our] judgment for those of our sentencing courts." State v. Case, 220 N.J. 49, 65 (2014) (citing State v. Lawless, 214 N.J. 594, 606 (2013)).

Turning first to defendant's contentions about being sentenced to an extended term, it is undisputed that he met all of the statutory requirements under N.J.S.A. 2C:44-3(a). Because defendant was statutorily eligible, he "could lawfully be sentenced within a range of between five and twenty years." State v. Abril, 444 N.J. Super. 553, 564 (App. Div. 2016). "Where, within that range of sentences, the court chooses to sentence a defendant remains in the sound judgment of the court," based on "the court's assessment of the aggravating and mitigating factors, including the consideration of the deterrent need to protect the public." State v. Pierce, 188 N.J. 155, 168-69 (2006). In reviewing the sentencing court's choice we "apply an abuse of discretion standard . . . ." Id. at 169-70.

Here, the trial judge sentenced defendant to fourteen years, which "plainly falls within the statutory range." Abril, 444 N.J. Super. at 564. Contrary to

defendant's arguments, "a finding of 'need to protect the public' is not a precondition to a defendant's eligibility for sentencing up to the top of the discretionary extended-term range." Pierce, 188 N.J. at 170. Moreover, the persistent offender statute does not require that a qualifying defendant's prior crimes be violent. State v. Bauman, 298 N.J. Super. 176, 211 (App. Div. 1997).

Nevertheless, the judge here evaluated the need for public protection. She found evidence that defendant had a propensity toward dangerous conduct and that the extended-term sentence was necessary to protect the public. She explained that defendant's repeated commission of crimes, despite being given probation, demonstrated he posed a risk to commit another offense and that there was a need to deter defendant and others.

Turning to defendant's argument that the judge erred in sentencing him to consecutive terms under N.J.S.A. 2C:44-5, at the outset we observe that a sentencing court has the sole discretion to impose consecutive or concurrent sentences. It must, however, consider the relevant criteria delineated in State v. Yarbough, 100 N.J. 627 (1985):

> (1) there can be no free crimes in a system for which the punishment shall fit the crime;
>
> (2) the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision;

(3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:

(a) the crimes and their objectives were predominantly independent of each other;

(b) the crimes involved separate acts of violence or threats of violence;

(c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;

(d) any of the crimes involved multiple victims;

(e) the convictions for which the sentences are to be imposed are numerous;

(4) there should be no double counting of aggravating factors; [and]

(5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense.

. . . .

[Yarbough, 100 N.J. at 643-44.]

The Yarbough factors essentially focus upon "the nature and number of offenses for which the defendant is being sentenced, whether the offenses occurred at different times or places, and whether they involve numerous or separate victims." State v. Carey, 168 N.J. 413, 423 (2001) (quoting State v.

Baylass, 114 N.J. 169, 180 (1989)).  They should be applied "qualitatively, not quantitatively."  Id. at 427.  A "court may impose consecutive sentences even though a majority of the Yarbough factors support concurrent sentences."  Id. at 427-28; see also State v. Swint, 328 N.J. Super. 236, 264 (App. Div. 2000) (stating that even when "offenses [are] connected by a 'unity of specific purpose,'" "somewhat interdependent of one another," and "committed within a short period of time," concurrent sentences need not be imposed (citation omitted)).  "When a sentencing court properly evaluates the Yarbough factors in light of the record, the court's decision will not normally be disturbed on appeal."  State v. Miller, 205 N.J. 109, 129 (2011).

Here, the trial judge properly evaluated the Yarbough factors and gave "[g]reat weight . . . to the factor concerning multiple victims."  Moreover, she found "that it was not necessarily a single act of violence," based upon the location of where each victim was when he was initially confronted, and their locations when the assaults began.  The judge stated "that . . . [the two men] were targeted separately by [defendant]."

We conclude that because "[c]rimes involving multiple deaths or victims who have sustained serious bodily injuries represent especially suitable circumstances for the imposition of consecutive sentences[,]" the trial court

properly exercised its discretion in imposing consecutive sentences. Carey, 168 N.J. at 428.

Finally, defendant's argument that the trial court erred in sentencing him to consecutive terms because he was not one of the shooters is without merit. Defendant was convicted as an accomplice and the same sentences are available whether a defendant is convicted as a principal or accomplice. See, e.g., State v. Robinson, 253 N.J. Super. 346, 356 (App Div. 1992); State v. Mancine, 124 N.J. 232, 259-60 (1991).

We are satisfied that the court did not violate the sentencing guidelines and the record amply supports its findings on aggravating and mitigating factors. The sentence is clearly reasonable and does not shock our judicial conscience.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION